53 9

1  **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2  Name ALVAREZ        VICENTE        A

FILED

(Last)           (First)           (Initial)

3

APR 29 2008

4  Prisoner Number  V·99688

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Institutional Address  KERN VALLEY STATE PRISON

5  P·O BOX 5102  DELANO, CA. 93216

6  =================================================================

7  **UNITED STATES DISTRICT COURT**
   **NORTHERN DISTRICT OF CALIFORNIA**

CW

8  VICENTE ARRAIGA ALVAREZ
   (Enter the full name of plaintiff in this action.)        )

9                                                            )    CV  08  2225

10                              vs.                          )    Case No. E039135

                                                             )    (To be provided by the clerk of court)
11  THE PEOPLE OF THE STATE OF                               )
                                                             )    **PETITION FOR A WRIT**
    CALIFORNIA.                                              )    **OF HABEAS CORPUS**
12                                                           )
                                                             )                            (PR)
13  _____                                 )
                                                             )
14  _____                                 )    E-filing
    (Enter the full name of respondent(s) or jailor in this action)  )

15

16  =================================================================
                    Read Comments Carefully Before Filling In

17  Underline  When and Where to File

18       You should file in the Northern District if you were convicted and sentenced in one of these

19  counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20  San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21  this district if you are challenging the manner in which your sentence is being executed, such as loss of

22  good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23       If you are challenging your conviction or sentence and you were not convicted and sentenced in

24  one of the above-named fifteen counties, your petition will likely be transferred to the United States

25  District Court for the district in which the state court that convicted and sentenced you is located. If

26  you are challenging the execution of your sentence and you are not in prison in one of these counties,

27  your petition will likely be transferred to the district court for the district that includes the institution

28  where you are confined. Habeas L.R. 2254-3(b).

1    <u>Who to Name as Respondent</u>

2        You must name the person in whose actual custody you are. This usually means the Warden or

3    jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4    you are imprisoned or by whom you were convicted and sentenced. These are not proper

5    respondents.

6        If you are not presently in custody pursuant to the state judgment against which you seek relief

7    but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8    custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9    was entered.

10   <u>A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

11       1. What sentence are you challenging in this petition?

12       (a)    Name and location of court that imposed sentence (for example; Alameda

13              County Superior Court, Oakland):

14   <u>RIVERSIDE COUNTY SUPERIOR COURT</u>        <u>RIVERSIDE</u>

15              Court                          Location

16       (b)    Case number, if known <u>SWF009113</u>

17       (c)    Date and terms of sentence <u>29 - LIFE</u>

18       (d)    Are you now in custody serving this term? (Custody means being in jail, on

19              parole or probation, etc.)          Yes <u>X</u>      No _____

20              Where?

21              Name of Institution: <u>KERN VALLEY STATE PRISON</u>

22              Address: <u>P.O BOX 5102  DELANO, CA, 93216</u>

23       2. For what crime were you given this sentence? (If your petition challenges a sentence for

24   more than one crime, list each crime separately using Penal Code numbers if known. If you are

25   challenging more than one sentence, you should file a different petition for each sentence.)

26   <u>ONE COUNT OF ATTEMPTED MURDER (PEN. CODE, 664/187) WITH AN ENHANCEMENT OF 20 YRS</u>
     <u>(PEN. CODE, 12022 (c). ALONG WITH ONE COUNT OF RESISTING ARREST (§69), ONE COUNT OF</u>

27   <u>ATTEMPTED ROBBERY (§664/211), ONE COUNT OF SECOND DEGREE BURGLARY (§459)</u>
     <u>AND A SECOND LESSER INCLUDED OFFENSE OF ASSAULT WITH A DEADLY</u>

28   <u>WEAPON (§245, SUBD (A)(2).</u>

PET. FOR WRIT OF HAB. CORPUS        - 2 -

3. Did you have any of the following?

    Arraignment:                         Yes __X__    No _____

    Preliminary Hearing:           Yes __x__    No _____

    Motion to Suppress:           Yes _____    No __X__

4. How did you plead?

    Guilty _____    Not Guilty __X__    Nolo Contendere _____

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

    Jury __X__    Judge alone_____    Judge alone on a transcript _____

6. Did you testify at your trial?          Yes __X__    No _____

7. Did you have an attorney at the following proceedings:

| | | | | |
|---|---|---|---|---|
| (a) | Arraignment | Yes __X__ | No _____ |
| (b) | Preliminary hearing | Yes __x__ | No _____ |
| (c) | Time of plea | Yes __x__ | No _____ |
| (d) | Trial | Yes __x__ | No _____ |
| (e) | Sentencing | Yes __x__ | No _____ |
| (f) | Appeal | Yes __x__ | No _____ |
| (g) | Other post-conviction proceeding | Yes _____ | No __X__ |

8. Did you appeal your conviction?       Yes __x__    No _____

    (a)    If you did, to what court(s) did you appeal?

            Court of Appeal          Yes __X__    No _____

            Year: _2006_    Result: _REJECTION_____

            Supreme Court of California    Yes __X__    No _____

            Year: _2007_    Result: _REJECTION_____

            Any other court          Yes _____    No __X__

            Year: _____    Result:_____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

1    petition?                                    Yes __X__    No____

2    (c)    Was there an opinion?                 Yes __X__    No____

3    (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                                 Yes ____    No_X__

5           If you did, give the name of the court and the result:

6    _____

7    _____

8    9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?    Yes ____    No_X__

10    [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11    challenged the same conviction you are challenging now and if that petition was denied or dismissed

12    with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13    for an order authorizing the district court to consider this petition.  You may not file a second or

14    subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28

15    U.S.C. §§ 2244(b).]

16    (a)    If you sought relief in any proceeding other than an appeal, answer the following

17           questions for each proceeding.  Attach extra paper if you need more space.

18    I.     Name of Court: _CALIFORNIA SUPREME COURT_

19           Type of Proceeding: _PETITION FOR REVIEW_

20           Grounds raised (Be brief but specific):

21           a._COURTS CONTINUE TO IMPOSE ENHANCEMENTS WHOSE INADEQUATE_
               _PLEADING FAILS TO SATISFY THE DEMANDS OF FEDERAL DUE PROCESS._
22           b._____

23           c._____

24           d._____

25           Result: _AFFIRMED_          Date of Result: _6/07_

26    II.    Name of Court: _CALIFORNIA SUPREME COURT_

27           Type of Proceeding: _PETITION FOR REVIEW_

28           Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS          - 4 -

a. COURTS CONTINUE TO APPLY THE INCORRECT STANDARD OF PREJUDICE WHEN A TRIAL COURT ERRONEOUSLY DISCOURAGES

b. JUST SHORT OF PRECLUDING JUROR QUESTIONS REGARDING THE MEANING OF LEGAL INSTRUCTIONS.

c. _____

d. _____

Result: ___AFFIRMED___    Date of Result: _6/07_

III.    Name of Court: _CALIFORNIA SUPREME COURT_

Type of Proceeding: _PETITION FOR REVIEW_

Grounds raised (Be brief but specific):

a. THE ERRONEOUS RECITATION OF CALJIC NOS. 1.22 AND 8.11 ON THE DEFINITION OF MALICE IN AN ATTEMPTED MURDER CASE

b. IS NOT RENDERED HARMLESS THROUGH RECITATION OF CALJIC NO. 8.66 AND ARGUMENT OF THE PROSECUTION.

c. _____

d. _____

Result: ___AFFIRMED___    Date of Result: _6/07_

IV.    Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result: _____    Date of Result: _____

(b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes ____    No _X_

Name and location of court: _____

B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS        - 5 -

1    need more space.  Answer the same questions for each claim.

2         [Note:  You must present ALL your claims in your first federal habeas petition.  Subsequent

3    petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4    499 U.S. 467,  111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5    Claim One: THE DELIBERATION ENHANCEMENT MUST BE STRICKEN BECAUSE

6    IT WAS NOT ALLEGED IN THE ACCUSATORY PLEADING IN VIOLATION OF

7    ~~Supporting Facts:~~ OF FEDERAL DUE PROCESS.

8    _____

9        * SUPPORTING FACTS OF CLAIM ONE ON ATTACHED EXTRA PAPER.

10   _____

11   Claim Two: THE TRIAL COURT'S NEAR PRECLUSION OF JUROR QUESTIONS

12   REGARDING THE MEANING OF LEGAL INSTRUCTIONS VIOLATED PETITIONER'S

13   ~~Supporting Facts:~~ FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS AND

14   TRIAL BY JURY AND CONSTITUTES STRUCTURAL ERROR.

15   _____

16       * SUPPORTING FACTS OF CLAIM TWO ON ATTACHED EXTRA PAPER.

17   Claim Three: THE TRIAL COURT'S ERRONEOUS DEFINITION OF MALICE —

18   AN ELEMENT OF THE OFFENSE — DENIED PETITIONER'S THE

19   Supporting Facts: FEDERAL CONSTITUTIONAL GUARANTEES OF DUE PROCESS

20   AND TRIAL BY JURY AND, ON THIS RECORD, MERITS REVERSAL.

21   _____

22       * SUPPORTING FACTS OF CLAIM THREE ON ATTACHED EXTRA PAPER

23        If any of these grounds was not previously presented to any other court, state briefly which

24   grounds were not presented and why:

25   _____

26   _____

27   _____

28   _____

PET. FOR WRIT OF HAB. CORPUS        - 6 -

1      List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3    of these cases:

4            *LIST ON ATTACHED EXTRA PAPER.*

5

6

7    Do you have an attorney for this petition?               Yes_____      No_X_

8    If you do, give the name and address of your attorney:

9

10     WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11    this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13    Executed on _____

14                 Date                        Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS      - 7 -

NAME AND CITATION OF
SUPPORTING CASES FOR:

## CLAIM I

Ex parte Hess (1955) 45 Cal. 2d 171

In re Hess (1955) 45 Cal. 2d 171

People v. Allen (1985) 165 Cal. App. 3d 616

People v. Bright (1996) 12 Cal. 4th 652

People v. Haskin (1992) 4 Cal. App. 4th 1434

People v. Lohbauer (1981) 29 Cal. 3d 364

People v. Mancebo (2002) 27 Cal. 4th 735

People v. Ramirez (1987) 189 Cal. App. 3d 603

People v. Seel (2004) 34 Cal. 4th 535

People v. Thomas (1987) 43 Cal. 3d 818

People v. Toro (1989) 47 Cal. 3d 966

People v. West (1970) 3 Cal. 3d 595

People v. Wolcott (1983) 34 Cal. 3d 92

(1)

# NAME AND CITATION OF SUPPORTING CASES FOR:

## CLAIM II

ARIZONA v. FULMINANTE (1991) 499 U.S 279[111 S. Ct. 1246, 113 L. Ed. 2d 302 . . . . . .

BOLLENBACH v. UNITED STATES (1946) 326 U.S. 607[66 S. Ct. 607, 90 L. Ed. 350] . . . . . .

CABANA v. BULLOCK (1986) 474 U.S 376[704 S. Ct. 689, 88 L. Ed. 2d 704] . . . . . . .

CARELLA v. CALIFORNIA (1989) 491 U.S 263[109 S. Ct 2419, 105 L. Ed. 2d 218] . . . . . . .

CARTER v. KENTUCKY (1981) 450 U.S. 288[101 S. Ct. 1112; 67 L. Ed. 2d 241] . . . . . .

DELAWARE v. VAN ARSDALL (1986) 475 U.S. 673[106 S. Ct 1431, 89 L. Ed. 2d 674] . . . . . .

DONNELLY v. DECHRISTOFORO (1974) 416 U.S. 637[94 S. Ct 1868, 40 L. Ed. 2d 431]

DOWNS v. STATE OF CALIFORNIA (1962) 202 Cal. App. 2d 609 . . . . . .

ESTATE OF MANN (1986) 184 Cal. App. 3d 593 . . . . .

GIDEON v. WAINWRIGHT (1963) 372 U.S. 335[83 S. Ct. 792; 9 L. Ed. 2d 799 . . . . ]

McCASKLE v. WIGGINS (1984) 465 U.S. 168[104 S. Ct. 944; 79 L. Ed. 2d 122]

1
2
3  NAME AND CITATION OF
4  SUPPORTING CASES FOR:
5
6  CLAIM II cont....
7
8  McDowell v. Calderon (9th Cir. 1997) 130 F.3d 833 ...
9  People v. Allen (1974) 41 Cal. App. 3d 196 .....
10  People v. Anderson (1994) 26 Cal. App. 4th 1241 ....
11  People v. Beardslee (1991) 53 Cal. 3d 68 .....
12  People v. Blanco (1992) 10 Cal. App. 4th 1167 .....
13  People v. Carpenter (1997) 15 Cal. 4th 312 .....
14  People v. Castillo (1997) 16 Cal. 4th 1009 ....
15  People v. DeJesus (1995) 38 Cal. App. 4th 1 .....
16  People v. Fitzpatrick (1992) 2 Cal. App. 4th 1285 ....
17  People Godwin (1995) 31 Cal. App. 4th 382 ......
18  People v. Gordon (1990) 50 Cal. 3d 1223 ......
19  People v. Hall (1989) 208 Cal. App. 3d 34 .....
20  People v. Norwood (1972) 26 Cal. App. 3d 148 .....
21  People v. Partida (2004) 121 Cal. App. 4th 202 ....
22  People v. Saunders (1993) 5 Cal. 4th 580 ......
23  People v. Smith (1992) 9 Cal. App. 4th 196 ......
24  People v. Thompkins (1987) 195 Cal. App. 3d 244 ....
25  People v. Vera (1997) 15 Cal. 4th 269. ....
26  People v. Whitehurst (1992) 9 Cal. App. 4th 1045 ...
27  People v. Williams (1998) 17 Cal. 4th 148
28  Rose v. Clark (1986) 478 U.S. 570 [106 S. Ct. 3101,

(3)

# NAME AND CITATION OF SUPPORTING CASES FOR

## CLAIM II CONT....

ROSE v. CLARK (1986) 478 U.S. 570 [106 S. Ct. 3101, 92 L. Ed. 2d 460] . . . . . . . . . . . . . . . . . . .

SULLIVAN v. LOUSIANA (1993) 508 U.S. 275 [113 S. Ct 2078  124 L. Ed. 2d 182] . . . . . . . . . . . . . .

THOMPSON v. CITY OF LOUISVILLE (1960) 362 U.S. 199 [80 S. Ct 624, 4 L. Ed. 2d 654] . . . . . . . . . . . .

TREJO v. MACIEL (1966) 239 CAL. APP. 2d 487 . . . . . .

TUMEY v. OHIO (1927) 273 U.S 510 [47 S. Ct. 437; 71 L. Ed. 749]. . . . . . . . . . . . . . .

UNITED STATES v. BOLDEN (D.C. CIR. 1975) 514 F.2d 1301. .

UNITED STATES v. GORDON (9TH CIR. 1988) 844 F.2d 1397.

UNITED STATES v. SPOCK (1ST CIR. 1969) 416 F.2d 165 . . . .

UNITED STATES v. WALKER (9TH CIR. 1978) 575 F.2d 209. .

VASQUEZ v. HILLERY (1986) 474 U.S 254 [106 S. Ct. 617 88 L. Ed. 2d 598] . . . . . . . . . . . .

WALLER v. GEORGIA (1984) 467 U.S. 39 [104 S. Ct 2210; 81 L. Ed. 2d 31] . . . . . . . . . . . . .

WHITE v. ILLINOIS (1992) 502 U.S. 346 [112 S. Ct 736; 116 L. Ed. 2d 848] . . . . . . . . . . .

WRIGHT v. UNITED STATES (D.C. CIR. 1957) 250 F.2d 4 . . . . . . . . . . . . . . . .

(4)

NAME AND CITATION OF
SUPPORTING CASES FOR:

## CLAIM III

ESTELLE V. MCGUIRE (1991) 502 U.S. 62 [112 S. Ct
        475, 116 L. Ed. 2d 385] . . . . . . . . . . .
FRANCIS V. FRANKLIN (1985) 471 U.S. 307 [105 S. Ct
        1965, 85 L. Ed. 2d 344 . . . . . . . . . . .
GRIFFIN V. UNITED STATES (1991) 502 U.S 46 [112
        S. Ct. 466, 116 L. Ed. 2d 371] . . . . . . . . .
PEOPLE V. CLAIR (1992) 2 Cal. 4th 629 . . . . . . . .
PEOPLE V. GREEN (1980) 27 Cal. 3d 1 . . . . . . . .
PEOPLE V. GUITON (1993 4 Cal. 4th 1116 . . . . . . .
PEOPLE V. GUZMAN (1999) 73 Cal. App. 4th 103 . . . .
PEOPLE V. SHADE (1986) 185 Cal. App. 3d 711 . . . .
SUNIGA V. BUNNELL (9th Cir. 1993) 998 F. 2d 664 . .

# CLAIM I: SUPPORTING FACTS

## THE DELIBERATION ENHANCEMENT MUST BE STRICKEN BECAUSE IT WAS NOT ALLEGED IN THE ACCUSATORY PLEADING IN VIOLATION OF FEDERAL DUE PROCESS.

APPELLANT OR PETITIONER WILL USE THE TERM "DELIBERATE" TO DENOTE THE PHRASE "WILLFUL, DELIBERATE, AND PREMEDITATED", AS USED IN PENAL CODE SECTIONS 189 AND 664, SUBDIVISION (A)

UNLIKE THE CRIMINAL OFFENSE OF MURDER, THE OFFENSE OF ATTEMPTED MURDER IS NOT DIVIDED INTO FIRST AND SECOND DEGREES BASED ON THE PRESENCE OF DELIBERATION (COMPARE PEN CODE, 189.) RATHER, ATTEMPTED MURDER IS BUT A SINGLE OFFENSE (PEN. CODE, 664, SUBD. (A); PEOPLE V. BRIGHT (1996) 12 CAL. 4TH 652, 670-671.)

HERE, THE INFORMATION DEPLOYS THE TERMS "WILLFULLY" "DELIBERATELY" AND "PREMEDITATEDLY" TO DESCRIBE COUNT NO. 1. (CT 93.) BUT IT DOES SO ONLY TO DESCRIBE THE OFFENSE CHARGED THEREIN. IT DOES NOT DESCRIBE THE DELIBERATION ENHANCEMENT. NOTE THAT THOSE THREE TERMS ARE USED IN THE FIRST PARAGRAPH OF THE INFORMATION, WHICH IS WHERE AN OFFENSE (AS OPPOSED TO AN ENHANCEMENT) IS TYPICALLY DESCRIBED. NOTE ALSO THAT THOSE TERMS ARE CONTAINED IN THE VERY FIRST SENTENCE DESCRIBING THE COUNT, WHICH AGAIN IS WHERE THE OFFENSE ITSELF (AS OPPOSED TO AN ENHANCEMENT) IS DESCRIBED. THE REASON FOR THIS IS PLAIN. IT IS ELEMENTARY THAT FOR THERE TO BE AN ENHANCEMENT TO AN OFFENSE, THERE MUST BE AN OFFENSE CHARGED. HERE THE OFFENSE, DESCRIBED IN THE FIRST SENTENCE OF THE INFORMATION IS PLAINLY DESCRIBING THE OFFENSE

(1)

1  CHARGED IN COUNT NO. 1. IT IS NOT DESCRIBING AN ENHANCEMENT TO THAT

2  OFFENSE. INDEED, ENHANCEMENTS ARE TYPICALLY CHARGED IN SENTENCES —

3  INDEED IN PARAGRAPHS — SUCCEDING THOSE THAT DESCRIBE THE

4  UNDERLYING OFFENSE — AS DOES THE SECOND PARAGRAPH OF THIS SAME

5  COUNT IN THIS SAME INFORMATION, IN DESCRIBING THE GUN DISCHARGE

6  ENHANCEMENT (PEN. CODE, 12022.53, SUBD. (C). (CT 93.) MOREOVER, THE

7  FIRST SENTENCE IN COUNT NO. 1 SPECIFICALLY REFERS TO SUBDIVISION (A)

8  OF PENAL CODE SECTION 187. IT MAKES NO REFERENCE WHATSOEVER TO A

9  SUBDIVISION OF PENAL CODE 664. PENAL CODE SECTION 664 GOVERNS

10  ATTEMTS GENERALLY. ATTEMPTED MURDER IS COMMONLY REFERRED TO

11  AS A "664/187", AS IT IS HERE. BUT THE DELIBERATION ENHANCEMENT

12  IS SPECIFICALLY CONTAINED IN PENAL CODE 664, SUBDIVISION (A)

13  AND IS TYPICALLY REFERRED TO AS SUCH. THIS INFORMATION MAKES NO

14  REFERENCE TO "PENAL CODE SECTION 664, SUBDIVISION (A)" IN LONG OR

15  SHORT FORM. THAT LIES IN STARK CONTRAST TO HOW THE INFORMATION

16  TO THE GUN DISCHARGE ENHANCEMENT IN THE SAME COUNT: "WITHIN THE

17  MEANING OF PENAL CODE SECTION 12022.53, SUBDIVISION (C)" (CT 93.)

18  FOR THESE REASONS, IT IS PLAIN THAT THE PROSECUTION FAILED TO

19  ALLEGE A PENAL CODE SECTION 664, SUBDIVISION (A) DELIBERATION

20  ENHANCEMENT OBTAINING TO ITS ATTEMPTED MURDER CHARGE —

21  NOTWITHSTANDING THE FACT THAT THE PROSECUTION QUITE MISTAKENLY

22  DESCRIBED THE OFFENSE AS IF IT WERE AN OFFENSE DIVIDED INTO

23  DEGREES.

24

25

26

27

28

1   THIS CONCLUSION IS FURTHERED BUTTRESSED BY THE BEHAVIOR OF

2   THE TRIAL COURT IN ITS FORMULATION OF JURY INSTRUCTIONS BASED ON

3   THE ATTEMPTED MURDER CHARGE. THE TRIAL COURT INSTRUCTED THE

4   JURORS ACCORDING TO CALJIC No. 17.11 THAT IF THEY HARBORED

5   "A RESEANABLE DOUBT AS TO WHETHER [ATTEMPTED MURDER] IS OF

6   THE FIRST OR SECOND DEGREE," YOU MUST FIND [APPELANT]

7   GUILTY OF THAT CRIME IN THE SECOND DEGREE." (CT 192 (ITALICS

8   ADDED). AS NOTED ABOVE, ATTEMPTED MURDER IS NOT A CRIME

9   DIVIDED INTO DEGREES. BUT THE PROSECUTION DESCRIBED IT THAT

10  WAY IN ITS CHARGING DOCUMENT. THE TRIAL COURT ALSO INSTRUCTED

11  THE JURORS ACCORDING TO CALJIC NO. 8.20 THAT, "ALL ATTEMPTED

12  MURDER WHICH IS PERPETRATED BY ANY KIND OF WILLFUL, DELIBERATE,

13  AND PREMEDITATED ATTEMPTED KILLING WITH EXPRESS MALICE

14  AFORETHOUGHT IS ATTEMPTED MURDER OF THE FIRST DEGREE." (CT 193

15  (ITALICS ADDED). AGAIN, ATTEMPTED MURDER IS NOT A CRIME DIVIDED

16  INTO DEGREES, BUT THAT IS HOW THE PROSECUTION CHARGED IT.

17  FINALLY, THE TRIAL COURT TOLD THE JURORS FOUR DIFFERENT TIMES

18  THAT "ATTEMPTED MURDER, NON WILLFUL, NON-DELIBERATE, NON-PREMEDITATED

19  IS A LESSER OFFENSE TO THE CRIME [OF] ATTEMPTED WILLFUL, DELIBERATE

20  AND PREMEDITATED MURDER." (CT 159, 187, 190 AND 191 (ITALICS

21  ADDED) YET AGAIN, THE CONCLUSION MUST BE DRAWN: THE

22  PROSECUTION PLAINLY CHARGED ATTEMPTED MURDER AS IF IT WERE

23  DIVIDED INTO DEGREES AND NEVER REFERRED TO SUBDIVISION (A)

24  OF SECTION 664. THEREFORE, IT DID NOT ALLEGE A DELIBERATION

25  ENHANCEMENT.

26      THE PROSECUTION'S FAILURE TO ALLEGE A DELIBERATION

27  ENHANCEMENT MEANS THAT THE TRIAL COURT WAS UNAUTHORIZED

28  BY LAW TO IMPOSE ONE AGAINST PETITIONER.

1  PENAL CODE SECTION 1170, SUBDIVISION (e) EXPRESSLY REQUIRES

2  THAT EVERY "ENHANCEMENT[]" BE PLEADED. NOTE THAT THE STATUTE

3  USES THE TERM "ENHANCEMENT" — NOT MERELY THE "FACTS"

4  UNDERLYING THE ENHANCEMENT. SIMILARLY, PENAL CODE SECTION 664,

5  SUBDIVISION (A) SPECIFICALLY STATES THAT THE DELIBERATION

6  ENHANCEMENT "SHALL NOT BE IMPOSED UNLESS THE FACT THAT THE

7  ATTEMPTED MURDER WAS WILLFULL, DELIBERATE, AND PREMEDITATED

8  IS CHARGED IN THE ACCUSATORY PLEADING."

9         BY WAY OF ANALOGY, SUBDIVISION (i) OF PENAL CODE SECTION

10 667.61 READS AS FOLLOWS: "FOR THE PENALTIES PROVIDED IN THIS SECTION

11 TO APPLY, THE EXISTENCE OF ANY FACT REQUIRED UNDER SUBDIVISION (d)

12 OR (e) SHALL BE ALLEGED IN THE ACCUSATORY PLEADING AND EAITHER

13 ADMITTED BY THE DEFENDANT IN OPEN COURT OR FOUND TO BE TRUE

14 BY THE TRIER OF FACT." THIS "PLEADING" LANGUAGE MIMICS THAT OF

15 PENAL CODE SECTION 664, SUBDIVISION (A) REFERENCED ABOVE.

16        THAT IS IMPORTANT BECAUSE SUBDIVISION (i) OF PENAL CODE

17 SECTION 667.61 WAS THE SUBJECT OF OUR STATE SUPREME COURT'S

18 OPINION IN PEOPLE V. MANCEBO (2002) 27 CAL.4TH 735. THE COURT

19 IN MANCEBO FOUND THE TRIAL COURT VIOLATED SUBDIVISION (i) BY

20 REPLACING AN ALLEGED GUN USE CIRCUMSTANCE (PEN. CODE, 667.61,

21 SUBD.(e)(4) WITH A MULTIPLE VICTIM CIRCUMSTANCE (PEN. CODE, 667.61,

22 SUBD.(e)(5) THAT HAD NOT BEEN ALLEGED IN THE ACCUSATORY

23 PLEADING. BY USING THE MULTIPLE VICTIM CIRCUMSTANCE TO SENTENCE

24 DEFENDANT UNDER SECTION 667.61, THE TRIAL COURT BELIEVED IT

25 COULD THEN USE THE GUN USE ALLEGATION TO SENTENCE

26 THE DEFENDANT TO AN ADDITIONAL ENHANCEMENT PERSUANT TO PENAL

27 CODE SECTION 12022.5, SUBDIVISION (A) (MANCEBO, SUPRA, 27 CAL.4TH

28 AT P. 740.)

1    Our state Supreme Court held that if a sentencing
2  statute specifies that the existense of any fact required
3  under the STATE. "shall be alleged in the accusatory
4  pleading," the plain wording of the statute controls, so
5  that substitution of a circumstance not pled in the
6  accusatory pleading in order to impose a harsher sentence
7  violates the explicit pleading provisions of the statute
8  (Id. at p. 743.) Moreover, the court held that nothing in
9  the factual allegations of the accusatory pleading apprised
10 petitioner that the prosecution intended to prove the facts
11 necessary to establish the un-alleged enhancement (Id. a p.
12 745.) That is important not only on statutory grounds, but
13 because "a defendant has a cognizable [federal constitutional]
14 due process right to fair notice of the specific enhancement
15 allegations that will be invoked to increase punishment
16 for his crimes." (Id., at p. 747 (Italics added)
17      Mancebo controls the outcome here. Petitioner has shown
18 that the prosecution failed to allege a Penal Code section 664,
19 subdivision (a) deliberation enhancement against petitioner.
20 Rather, it mistakenly described the offense as if were divided
21 into degrees. Thus, the prosecution failed to inform
22 petitioner that it intended to seek imposition of that enhancement.
23 As in Mancebo, the accusatory pleading failed to put
24 appellant on notice that, if convicted, he could subject to
25 a life term enhancement.
26      Next, even if an information that was amended prior
27 to jury deliberations to include previously uncharged
28 enhancement allegations satisfies due process and state

(5)

1  STATUTORY REQUIREMENTS — AND DISTINGUISHES THE CASE AT BAR

2  FROM MANCEBO — THE RECORD ON APPEAL INCLUDES NO SUCH

3  INDICATION THAT THE INFORMATION WAS EVER AMENDED.

4      PEOPLE V. THOMAS (1987) 43 CAL. 3d 818 DOES NOT COMPEL

5  A DIFFERENT RESULT. AS MANCEBO EXPLAINS, THOMAS ADDRESSED

6  THE ISSUE OF WHETHER A PERSON ACCUSED OF GENERAL

7  MANSLAUGHTER COULD BE CONVICTED OF INVOLUNTARY

8  MANSLAUGHTER WHERE THE ACCUSATORY PLEADING ALLEGED

9  THE KILLING WAS WILLFUL. THE COURT IN THOMAS CONCLUDED

10 THAT INCLUSION OF THE WORD "WILLFULLY" IN THE ACCUSATORY

11 PLEADING DID NOT CHANGE THE CRIME CHARGED FROM

12 MANSLAUGHTER GENERALLY TO VOLUNTARY MANSLAUGHTER

13 EXCLUSIVELY. (MANCEBO, SUPRA, 27 CAL. 4TH AT P. 748.) MANCEBO

14 CLARIFIED THAT THOMAS DOES NOT STAND FOR THE GENERAL

15 PROPOSITION THAT AN UNCHARGED ENHANCEMENT MAY BE IMPOSED

16 WHERE THE ALLEGATIONS IN THE PLEADINGS DO NOT PUT THE

17 DEFENDANT ON NOTICE THAT THE FACTS UNDERLYING THE

18 UNCHARGED ENHANCEMENT WOULD BE AT ISSUE. (Id. at P. 748.)

19      DEFENDANT HAS A FEDERAL CONSTITUTIONAL DUE PROCESS

20 RIGHT TO BE ADVISED OF THE CHARGES AGAINST HIM IN ORDER

21 THAT HE MAY HAVE A REASONABLE OPPORTUNITY TO PREPARE AND

22 PRESENT HIS DEFENSE. (U.S. CONST. AMEND. VI AND XIV; PEOPLE V.

23 LOHBAUER (1981) 29 CAL. 3d 364, 369.). ACCORDINGLY, DEFENDANT

24 MAY NOT BE CONVICTED OF AN OFFENSE THAT IS NEITHER SPECIFICALLY

25 CHARGED IN THE ACCUSATORY PLEADING NOR NECESSARILY

26 INCLUDED WITHIN A CHARGED OFFENSE (Id. at P. 367.). TO

27 OBTAIN REVERSAL, DEFENDANT NEED NOT SHOW THAT HE WAS

28 MISLED TO HIS PREJUDICE OR OTHERWISE PREVENTED FROM

(6)

1  PREPARING AN EFFECTIVE DEFENSE. (Id. at P. 370.)

2  DEFENDANT SIMILARLY HAS A DUE PROCESS RIGHT TO FAIR

3  NOTICE OF THE PENALTIES THAT ARE BEING SOUGHT AGAINST HIM—

4  NAMELY, THE SPECIFIC SENTENCE ENHANCEMENT ALLEGATIONS THAT

5  MAY BE INVOKED TO INCREASE PUNISHMENT FOR HIS CRIMES (PEN.

6  CODE, 1170.1, SUBD (E); MANCEBO, SUPRA, 27 CAL. 4TH AT P. 747; PEOPLE VS.

7  HASKIN (1992) 4 CAL. APP. 4TH 1434, 1438.) THE LOHBAUER REASONING

8  COMPELS THE CONCLUSION THAT DEFENDANT MAY NOT BE CONVICTED OF

9  AN ENHANCEMENT THAT IS NEITHER SPECIFICALLY CHARGED IN THE

10  ACCUSATORY PLEADING NOR NESESSARILY INCLUDED WITHIN A

11  CHARGED ENHANCEMENT. (LOHBAUER, SUPRA, 29 CAL. 3D AT P. 364;

12  SEE ALSO PEOPLE V. ALLEN (1985) 165 CAL. APP. 3D 616, 627.) AS

13  SUCH THE DELIBERATION ENHANCEMENT SHOULD BE STRICKEN.

14

15  THE PROSECUTION'S FAILURE TO PLEAD A DELIBERATION

16  ENHANCEMENT IS PROPERLY SUBJECT TO REVIEW ABSENT OBJECTION

17  BELOW. WITHOUT DEFENDANT'S CONSENT TO CONVICTION ON AN

18  UNCHARGED OFFENSE, A COURT LACKS JURISDICTION TO SO

19  CONVICT HIM. (PEOPLE V. WEST (1970) 3 CAL. 3D 595, 612.) IF

20  THE COURT LACKS JURISDICTION TO CONVICT, THE ISSUE CANNOT BE

21  SUBJECT TO A HARMLESS ERROR ANALYSIS. WHEN A COURT ACTS

22  IN EXCESS OF ITS JURISDICTION IN ENTERING THE JUDGMENT,

23  THE JUDGMENT OF CONVICTION IS ITSELF UNLAWFUL. IT IS NOT

24  SIMPLY A "TRIAL ERROR." (EX PARTE HESS (1955) 45 CAL. 2ND 171, 175.)

25  NOR WAS THE DELIBERATION ENHANCEMENT "ADDED" TO THE

26  ACCUSATORY INFORMATION BY REFERENCE IN THE VERDICT FORMS

27  AND THE JURY INSTRUCTIONS. PETITIONERS LACK OF OBJECTION

28  TO THOSE FORMS AND INSTRUCTIONS DOES NOT IMPLY HIS

1   CONSENT TO THE ADDITION OF THE DELIBERATION ALLEGATION.

2   CONSIDER THAT THE REASON FOR PERMITTING CONVICTIONS ON

3   LESSER RELATED OFFENSES ABSENT CONSENT IS BECAUSE IT

4   BENEFITS THE DEFENDANT IN SITUATIONS WHERE THE EVIDENCE

5   SHOWS HE OR SHE IS GUILTY OF SOME OFFENSE BUT NOT

6   NECESSARILY THE CHARGE CHOSEN BY THE PROSECUTOR. GIVING

7   THE JURORS AN OPTION TO CONVICT ON A LESSER RELATED OFFENSE

8   RELIEVES THE PRESSURE TO CONVICT ON THE CHARGE. (PEOPLE V.

9   TORO (1989) 47 CAL. 3d 966, 974.) THERE IS NO COMPARABLE

10  BENEFIT TO A DEFENDANT CONVICTED OF A GREATER OFFENSE THAN

11  THAT CHARGED — OR AN ENHANCEMENT THAT WAS NOT CHARGED

12  IN THE FIRST PLACE. A DEFENDANT WOULD HAVE NO INCENTIVE

13  TO FAIL TO OBJECT IN THE HOPE OF BEING CONVICTED OF A

14  GREATER CRIME. AS A RESULT, IN PETITIONER'S SITUATION,

15  INFERRING CONSENT BASED ON A LACK OF OBJECTION DEFIES

16  COMMON SENSE. (PEOPLE V. RAMIREZ (1987) 189 CAL. APP. 3d 603, 623

17  ["CONVICTION FOR AN UNCHARGED GREATER OFFENSE NOT ONLY

18  RAISES THE PROBLEM OF NOTICE BUT MAKES THE INFERENCE OF

19  CONSENT MORE DIFFICULT, AS THERE IS NO REASON WHY A

20  DEFENDANT SHOULD ACQUIESCE IN SUBSTITUTION OF A GREATER

21  FOR A LESSER OFFENSE"]

22      FOR THESE REASONS, THIS HONORABLE COURT SHOULD

23  DIRECT THE SUPERIOR COURT TO STRIKE THE JURORS' "TRUE"

24  FINDING OF A SECTION 664, SUBDIVISION (a) DELIBERATION

25  ALLEGATION AS TO COUNT NO. 1 AND THE ATTENDANT TERM

26  IMPOSED.

27

28

1

2  FINALLY, <u>PEOPLE v. SEEL (2004) 34 CAL.4TH 535</u> DOES NOT

3  COMPEL A DIFFERENT RESULT.

4  <u>SEEL</u> STANDS FOR THE PROPOSITION THAT <u>FOR SPECIFIED</u>

5  <u>PURPOSES</u>, A SENTENCE ENHANCEMENT MUST BE VIEWED AS AN

6  ELEMENT OF A SINGLE GREATER OFFENSE THAT ALSO INCORPORATES

7  THE OFFENSE CHARGED — NOTWITHSTANDING THE SEPERATE

8  STATUTORY EXPRESSION OF THE ENHANCEMENT AND THE CHARGED

9  OFFENSE. ONE SUCH PURPOSE IS THE FEDERAL CONSTITUTIONAL

10 DOUBLE JEOPARDY CLAUSE. (Id. at p. 544.)

11  THERE IS NO AUTHORITY THAT THOSE PURPOSES EXTEND TO

12 CHARGING OBLIGATIONS STEMMING FROM STATUTE AND FEDERAL DUE

13 PROCESS. INDEED, THERE IS NO AUTHORITY THAT THOSE PURPOSES

14 INCLUDE CONSIDERATION IN THE DETERMINATION OF LESSER

15 INCLUDED OFFENSES <u>(PEOPLE v. WOLCOTT (1983) 34 CAL.3d 92, 96)</u>

16 OR IN THE DETERMINATION OF DOUBLE PUNISHMENT (PEN. CODE, 654).

17  MOREOVER, EVEN IF DELIBERATE ATTEMPTED MURDER WAS

18 CONSIDERED A DISTINCT OFFENSE, THE OBLIGATION TO CHARGE

19 IT AS SUCH REMAINS. AS NOTED ABOVE, THE PROSECUTION

20 FAILED TO CHARGE DELIBERATE ATTEMPTED MURDER AS A

21 SEPERATE OFFENSE WITH REFERENCE TO SUBDIVISION (A) OF

22 PENAL CODE SECTION 664. HENCE, THE SAME RESULT OBTAINS.

23 (SEE <u>IN RE HESS (1955) 45 CAL.2d 171, 174-175.</u>)

24

25

26

27

28

# CLAIM II : SUPPORTING FACTS

## COURTS CONTINUE TO APPLY THE INCORRECT STANDARD OF PREJUDICE WHEN A TRIAL COURT ERRONEOUSLY DISCOURAGES JUST SHORT OF PRECLUDING JUROR QUESTIONS REGARDING THE MEANING OF LEGAL INSTRUCTIONS.

At the close of evidence and just prior to instruction and argument in this case, the trial court launched into an extemporaneous exposition on the meaning of its instructions to the juror:

Not every concept, not every situation, not every word usage, not every possibility is necessarily included in the instructions.....

If you have a question regarding the jury instructions, you can make a request of us....

Sometimes, jurors have a request regarding the jury instructions. They would like us to define some words in the instructions, they would like to have the instruction explained a little differently, or they would request tha we provide an instruction that assists the jurors in understanding the instruction

(1)

1     IN QUESTION.

2

3        WHEN THAT HAPPENS, GENERALLY OUR RESPONSE IS,

4     "REREAD THE INSTRUCTION." SO THE LIKELIHOOD, THE

5     ODDS, OF US GIVING YOU SOME MORE, FURTHER

6     INSTRUCTIONS AFTER THE INITIAL PACKET THAT WILL

7     BE READ TO YOU — PRETTY REMOTE. PROBABLY IS NOT

8     GOING TO HAPPEN. SO IF YOU DO HAVE A QUESTION

9     REGARDING THE WORDING ITSELF, WE JUST REQUEST

10    YOU READ IT, REREAD THAT INSTRUCTION IN LIGHT OF ALL

11    THE OTHER ONES THAT MIGHT PERTAIN TO THAT

12    PARTICULAR ISSUE.

13    (1 RT 320-321.)

14       BECAUSE THESE REMARKS AMOUNTED TO A POWERFUL

15    DISINCENTIVE FOR JUROR INQUIRY INTO THE MEANING OF LEGAL

16    INSTRUCTIONS — NEARLY PRECLUDING SUCH INQUIRY — THEY

17    VIOLATED PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO

18    DUE PROCESS AND BY JURY TRIAL. (U.S. CONST. AMENDS V, VI & XIV.)

19       THE TRIAL COURT EXPLAINED THE ORIGIN OF JUROR QUESTIONS

20    REGARDING THE MEANING OF INSTRUCTIONS QUITE WELL, POINTING

21    OUT THAT LAY JURORS SOMETIMES DESIRE ADDITIONAL

22    LANGUAGE THAT COULD "ASSIST THEM IN UNDERSTANDING" THE

23    MANY COMPLEX AND INTERRELATED LEGAL PRINCIPLES RECITED

24    IN STANDARD INSTRUCTIONS.

25       THEN THE TRIAL COURT ALL BUT SLAMMED THE DOOR ON

26    REQUESTS FOR SUCH ASSISTANCE.

27       "GENERALLY, OUR RESPONSE IS: 'REREAD THE INSTRUCTIONS.'"

28       "THE ODDS OF CLARIFYING INSTRUCTIONS ARE PRETTY REMOTE.

(2)

1  PROBABLY NOT GOING TO HAPPEN."

2  "IF QUESTIONS ARISE, JUST REREAD THE STANDARD INSTRUCTIONS."

3  THIS "GUIDANCE" BY THE TRIAL COURT BELIES A *MISUNDERSTANDING*

4  OF ITS ROLE WITH REGARD TO INSTRUCTION ON THE CASE. SUCH IS

5  NOT TO SIMPLY READ STANDARD INSTRUCTIONS AND KEEP POINTING

6  JURORS THERETO LIKE A ROAD SIGN OR BROKEN RECORD. RATHER,

7  IT IS TO INFORM, EXPAND, ELUCIDATE, AND CLARIFY WHEN QUESTIONS

8  ARISE IN THE MINDS OF LAY JURORS.

9  THE TRIAL COURT'S MISAPPREHENSION OF ITS ROLE IS MOST

10 PELLUCID IN ITS POSITION THAT RE-RECITATION OF STANDARD

11 INSTRUCTIONS IS BOTH THE TYPICAL AND SUFFICIENT RESPONSE TO

12 JUROR INQUIRY — AND THAT, AS SUCH, JURORS SHOULD NOT POSE

13 QUESTIONS IN THE FIRST PLACE BECAUSE THE ODDS FOR FURTHER

14 ELUCIDATION FROM THE TRIAL COURT ARE "PRETTY REMOTE."

15 TO THE CONTRARY, "THERE IS NO POINT IN REITERATING

16 LANGUAGE WICH HAS FAILED TO ENLIGHTEN THE JURY" (UNITED

17 STATES V. BOLDEN (D.C. CIR. 1975) 514 F.2d 1301, 1308-1309.) IF

18 AN INQUIRY INDICATES THE JURORS DO NOT UNDERSTAND THE

19 ORIGINAL INSTRUCTIONS, SIMPLY READING THOSE SAME

20 INSTRUCTIONS AGAIN MAY VERY WELL BE INSUFFICIENT.

21 (PEOPLE V. THOMPKINS (1987) 195 CAL. APP. 3d 244, 253;

22 ESTATE OF MANN (1986) 184 CAL. APP. 3d 593, 614.)

23 IN PEOPLE V. GONZALEZ (1999) 74 CAL. APP. 4TH 382, THE

24 COURT CONCLUDED THAT, "UNFORTUNATELY, THE TRIAL COURT'S

25 FAILURE IN THE PRESENT CASE TO AID THE JURY DURING ITS

26 DELIBERATIONS BY PROVIDING ADEQUATE INSTRUCTIONS IN

27 RESPONSE TO ITS INQUIRY IS A FAILURE WE PERCEIVE IS ALL

28 TOO COMMON. REREADING PREVIOUSLY GIVING STANDARD

(3)

1    CALJIC instructions in response to a jury's question

2    on the law when those instructions are inadequate

3    rather than responding directly to the jury's questions

4    out of fear of committing error is not a rarity."

5    (Id, at p. 389-390; see <u>United States v. Gordon</u> (9th Cir. 1988)

6    844 F.2d 1397, 1401-1402 [error to rely on original

7    instruction where jury expressed confusion regarding

8    conspiracy counts].)

9        <u>McDowell v. Calderon</u> (9th Cir. 1997) 130 F.3d 833

10   confirms this view. There, the court invalidated the

11   conviction because "the trial judge did not identify the

12   exact problem confounding the eleven jurors. He simply

13   referred the jurors to the originals instructions with

14   them all along. Both sides agree the instructions were

15   technically flawless. They were, however, the same

16   instructions that for some unknown reason eleven of

17   the jurors did not correctly understand in the first place ....

18   The unremarkable prescription for [juror] confusion is

19   that when a jury makes explicit its difficulties a trial

20   judge should *clear* them away with concrete accuracy."

21   (Id, at p. 838 [citations and quotations ommitted].

22       The fact that rereading standard instructions

23   is insufficient to ensure jurors' understanding as a

24   matter of course reflects the larger role of the trial

25   court in context of juror inquiry.

26       "Instructions are given on the relevant law

27   simply because we do not presume a jury composed of

28   lay *persons* is knowledgeable in the law." (<u>People v.</u>

(4)

1   WHITEHURST (1992) 9 CAL. APP. 4TH 1045, 1050; ACCORD
2   CARTER V. KENTUCKY (1981) 450 U.S. 288, 302 [101 S. CT. 1112; 67
3   L. ED. 2D 241].

4         THE DUTY TO RESPOND TO JUROR INQUIRIES ON MATTERS OF
5   INSTRUCTION EXISTS BECAUSE, IN A TRIAL BY JURY, "THE JUDGE
6   IS NOT A MERE MODERATOR, BUT IS THE GOVERNOR OF THE TRIAL
7   FOR THE PURPOSE OF ASSURING ITS PROPER CONDUCT AND OF
8   DETERMINING QUESTIONS OF LAW." (BOLLENBACH V. UNITED STATES
9   (1946) 326 U.S. 607, 612-613 [66 S. CT 607, 90 L. ED 350].) FOR
10  IN ORDER TO "PERFORM THEIR JOB PROPERLY AND FAIRLY, JURORS
11  MUST UNDERSTAND THE LEGAL PRINCIPLE THEY ARE CHARGED WITH
12  APPLYING, A JURY'S REQUEST FOR CLARIFICATION SHOULD ALERT
13  THE TRIAL JUDGE THAT THE JURY HAS FOCUSED ON WHAT IT
14  BELIEVES ARE THE CRITICAL ISSUES IN THE CASE. THE JUDGE
15  MUST GIVE THESE INQUIRIES SERIOUS CONSIDERATION." (PEOPLE V.
16  THOMPKINS (1987) 195 CAL. APP. 3D 244, 250 (ITALICS ADDED.)
17        THE DUTY EXTENDS TO ACTIVELY DETERMINE THE SOURCE OF
18  ANY CONFUSION OR LACK OF UNDERSTANDING AND KEENLY RECTIFY
19  IT. "THE RESPONSIBILITY FOR ADEQUATE INSTRUCTION BECOMES
20  PARTICULARLY ACUTE WHEN THE JURY ASKS FOR SPECIFIC GUIDANCE."
21  (TREJO V. MACIEL (1966) 239 CAL. APP. 2D 487, 498. (ITALICS ADDED)
22  WHERE "THE NEED FOR MORE [INSTRUCTION] APPEARS, IT IS THE
23  DUTY OF THE JUDGE ... TO PROVIDE THE JURY WITH LIGHT AND
24  GUIDANCE IN THE PERFORMANCE OF ITS TASK." (WRIGHT V.
25  UNITED STATES (D.C. CIR. 1957) 250 F. 2D 4, 11) "WHEN A JURY
26  MAKES EXPLICIT ITS DIFFICULTIES A TRIAL JUDGE SHOULD CLEAR
27  THEM AWAY WITH CONCRETE ACCURACY." (BOLLENBACH V. UNITED
28  STATES (1946) 326 U.S. 607, 612-613 [66 S. CT 607, 90 L. ED 350];

1  SEE ALSO <u>UNITED STATES v. WALKER</u> (9TH CIR. 1978) 575 F.2d 209,

2  213 [TRIAL COURT'S RESPONSE TO JURY CONFUSION ABOUT A

3  CONTROLLING LEGAL PRINCIPLE WAS INSUFFICIENT BECAUSE

4  IT FAILED TO ELIMINATE THAT CONFUSION].

5      IN SUM, A TRIAL COURT IS ENTRUSTED TO DISCHARGE ITS

6  MANDATORY DUTY TO CLEAR UP ANY INSTRUCTIONAL CONFUSION

7  EXPRESSED BY THE JURY. (<u>PEOPLE v. BEARDSLEE</u> (1991) 53 CAL. 3d 68

8  96-97.)

9      THE TRIAL COURT FAILED TO DO SO HERE BECAUSE IT

10  SUBSTANTIVELY PRECLUDED JUROR INQUIRY ARISING FROM PROBLEMS

11  COMPREHENDING THE INSTRUCTIONS ALREADY RECITED. "GENERALLY,

12  OUR RESPONSE IS: 'REREAD THE INSTRUCTIONS." "THE ODDS OF

13  CLARIFYNG INSTRUCTIONS ARE PRETTY REMOTE. PROBABLY NOT GOING

14  TO HAPPEN." "IF QUESTIONS ARISE, JUST REREAD THE STANDARD

15  INSTRUCTIONS." THIS "GUIDANCE" BY THE TRIAL COURT IS COMPLETELY

16  AT ODDS WITH ITS STATUTORY AND CONSTITUTIONAL ROLE

17  DESCRIBED ABOVE. IF THE ODDS FOR ANY ADDITIONAL ASSISTANCE

18  IN UNDERSTANDING THE INSTRUCTIONS (BEYOND AN INVITATION

19  TO REREAD THEM YET AGAIN) ARE "PRETTY REMOTE," THERE

20  IS SCANT REASON TO INQUIRE FOR HELP IN THE FIRST PLACE.

21  A TRIAL CANNOT EFFECTIVELY PRECLUDE JUROR INQUIRY INTO

22  QUESTIONS OF LAW STEMMING FROM INADEQUATE UNDERSTANDING

23  AND STILL COMPORT WITH THE OBLIGATIONS IMPOSED BY

24  THE FEDERAL CONSTITUTIONAL GUARANTEES OF DUE PROCESS

25  AND TRIAL BY JURY.

26

27

28

"RELIABILITY IS . . . A DUE PROCESS CONCERN." WHITE V.
ILLINOIS (1992) 502 U.S. 346, 363-364 [112 S.Ct 736; 116 L.Ed.2d 848].)
HENCE, THE DUE PROCESS CLAUSES OF THE FEDERAL CONSTITUTION
(U.S. CONST. AMENDS. V AND XIV) REQUIRE THAT CRIMINAL
CONVICTIONS BE RELIABLE AND TRUSTWORTHY. (SEE DONNELLY V.
DECHRISTOFORO (1974) 416 U.S. 637, 646 [94 S.Ct 1868, 40 L.Ed.2d
431]; THOMPSON V. CITY OF LOUISVILLE (1960) 362 U.S. 199, 204
[80 S.Ct 624, 4 L.Ed.2d 654]. RELIABILITY IS INCONSISTENT WITH
THE ERROR AT HAND. FURTHER, THE RIGHT TO TRIAL BY JURY (U.S.
CONST AMEND. VI) REQUIRES THAT THE JURORS MAINTAIN AN
ADEQUATE GRASP ON THE CONTROLLING LAW. (SEE CARELLA V.
CALIFORNIA (1989) 491 U.S. 263, 265-266 [109 S.Ct 2419, 105
L.Ed.2d 218]; CABANA V. BULLOCK (1986) 474 U.S 376, 384-
386 [704 S.Ct 689, 88 L.Ed.2d 704]; UNITED STATES V. SPOCK
(1ST CIR. 1969) 416 F.2d 165, 182.) THAT GUARANTEE IS ALSO
FRUSTRATED BY THE ERROR. FOR THESE REASONS, THE TRIAL
COURT'S REMARKS ON JUROR INQUIRY CONSTITUTE ERROR.

THE ERROR IS REVIEWABLE ABSENT OBJECTION. A TRIAL
COURT "MAY GIVE ONLY SUCH INSTRUCTIONS AS ARE CORRECT
STATEMENTS OF THE LAW." (PEOPLE V. GORDON (1990) 50 CAL.3d
1223, 1275; PEOPLE V. CASTILLO (1997) 16 CAL.4TH 1009, 1015
["EVEN IF THE COURT HAS NO SUA SPONTE DUTY TO INSTRUCT
ON A PARTICULAR LEGAL POINT, WHEN IT DOES CHOOSE TO
INSTRUCT, IT MUST DO SO CORRECTLY"].) SINCE THE TRIAL
COURT'S DIRECTION ON INSTRUCTION-RELATED JUROR INQUIRIES
CONTRADICTED ITS CONSTITUTIONALLY MANDATED ROLE, IT IS

(7)

1    REVIEWABLE ABSENT OBJECTION.

2        IN THE ALTERNATIVE, THIS ERROR IS SUBJECT TO REVIEW

3    ABSENT OBJECTION BECAUSE IT AFFECTED PETITIONER'S

4    SUBSTANTIAL RIGHTS. THE TRIAL COURT'S DIRECTIONS DENIED

5    PETITIONER  THE GUARANTEE OF DUE PROCESS AND TRIAL BY JURY.

6    THAT IS A SERIOUS VIOLATION. "[A]PPELLATE COURTS MAY REVIEW

7    ANY INSTRUCTION GIVEN EVEN THOUGH NO OBJECTION WAS MADE

8    IF A SUBSTANTIAL RIGHT OF THE DEFENDANT IS AFFECTED."

9    (PEOPLE V. GODWIN (1995) 31 CAL. APP. 4TH 1112, 1116; PEOPLE V.

10   ANDERSON (1995) 36 CAL. APP. 4TH 1241, 1249; PEN CODE 1259 [SAME]

11   CALIFORNIA COURTS HAVE CONSISTENLY HELD THAT KEY

12   INSTRUCTIONAL ERRORS IMPLICATING FEDERAL CONSTITUTIONAL

13   RIGHTS — SUCH AS THAT RAISED HERE – MAY BE CHALLENGED ON

14   APPEAL ABSENT OBJECTION BELOW. (SEE PEOPLE V. CARPENTER

15   (1997) 15 CAL. 4TH 312, 380-381 [DEFENDANT MAY CHALLENGE ON

16   APPEAL THE PREPONDERANCE OF THE EVIDENCE STANDARD FOR

17   OTHER CRIMES EVIDENCE WITHOUT THE PROPER LEGAL OBJECTION];

18   PEOPLE V. FITZPATRICK (1992) 2 CAL. APP. 4TH 1285, 1291 [COURT'S

19   DEFINITION OF "WRONGFULLY" COULD BE REVIEWED ON APPEAL

20   WITHOUT OBJECTION]; PEOPLE V. HALL (1989) 208 CAL. APP. 3D 34, 47

21   [INSTRUCTION ON UNJOINED PERPETRATOR COULD BE REVIEWED ON

22   APPEAL WITHOUT OBJECTION]; AS WAS WELL STATED IN

23   PEOPLE V. SMITH (1992) 9 CAL. APP. 4TH 196:

24

25        THE PEOPLE MAKE THEIR OFT-REPEATED, BUT ONLY OCASIONALLY

26        APPLICABLE, CONTENTION THE ISSUE WAS WAIVED, OR

27        ALTERNATIVELY THAT ANY ERROR WAS INVITED, BECAUSE

28        DEFENDANTS FAILED TO OBJECT TO, OR REQUEST

(8)

1  MODIFICATION OF, THE CHALLENGED INSTRUCTION. AS

2  APPELLATE COURT'S HAVE EXPLAINED TIME AND AGAIN,

3  MERELY ACCEDING TO AN ERRONEOUS INSTRUCTION DOES

4  NOT CONSTITUTE INVITED ERROR. NOR MUST A DEFENDANT

5  REQUEST AMPLIFICATION OR MODIFICATION IN ORDER TO

6  PRESERVE THE ISSUE FOR APPEAL WHERE, AS HERE, THE

7  ERROR CONSISTS OF A BREACH OF THE TRIAL COURT'S

8  FUNDAMENTAL INSTRUCTIONAL DUTY.

9  (Id. at P. 207, FN. 20.)

10  FINALLY, FEDERAL CONSTITUTIONAL CLAIMS GENERALLY

11  ARE ROUTINELY ADDRESSED FOR THE FIRST TIME ON APPEAL IN

12  GENERAL. (SEE PEOPLE V. VERA (1997) 15 CAL.4TH 269, 276; ACCORD,

13  PEOPLE V. SAUNDERS (1993) 5 CAL.4TH 580, 589, FN. 5 ["DEFENDANT'S

14  FAILURE TO OBJECT WOULD NOT PRECLUDE HIS ASSERTING ON APPEAL

15  THAT HE WAS DENIED HIS CONSTITUTIONAL RIGHT TO A JURY TRIAL"]

16  PEOPLE V. BLANCO (1992) 10 CAL.APP.4TH 1167, 1172-1173; PEOPLE V.

17  ALLEN (1974) 41 CAL.APP.3d 196, 201, FN.1; PEOPLE V. NORWOOD (1972)

18  26 CAL.APP.3d 148, 153.) SINCE THIS ISSUE IMPLICATES IMPORTANT

19  CONSTITUTIONAL RIGHTS IMPLICATING THE RELIABILITY OF THE

20  VERDICT, THIS HONORABLE COURT SHOULD USE ITS WIDE-RANGING

21  DISCRETION TO REVIEW IT. (IN RE S.B. (2004) 32 CAL.4TH 1287,

22  1293 ["APPLICATION OF THE FORFEITURE RULE IS NOT AUTOMATIC"]

23  PEOPLE V. WILLIAMS (1998) 17 CAL.4TH 148, 161, FN.6 [EVEN IF

24  A PARTY CANNOT RAISE A COMPLAINT ABOUT SENTENCING

25  ISSUE, THE APPELLATE COURT MAY ADDRESS SUCH AN ISSUE

26  IF IT CHOOSES TO DO SO]; PEOPLE V. DEJESUS (1995) 38

27  CAL.APP.4TH 1, 27 [ADDRESSING DEFENDANT'S CLAIM OF CRUEL

28  OR UNUSUAL PUNISHMENT DESPITE FINDING WAIVER TO

1  FORESTALL A CLAIM OF INEFFECTIVE ASSISTANCE OF COUSEL];

2  PEOPLE v. PARTIDA (2004) 121 CAL. APP. 4TH 202, 212 [APPELLATE

3  COURT "WOULD, IF NECESSARY, ELECT TO EXERCISE OUR DISCRETION

4  TO CONSIDER THE DUE PROCESS ISSUE"].)

5      FOR THESE REASONS, THE ERROR IS RIPE FOR

6  REVIEW.

7      THE ERROR IS STRUCTURAL AND MERITS REVERSAL

8  PER SE.

9      IN ARIZONA v. FULMINANTE (1991) 499 U.S. 279 [111 S. Ct

10  1246, 113 L. Ed. 2d 302], THE SUPREME COURT DISCUSSED THE

11  APPLICATION OF HARMLESS ERROR ANALYSIS TO VARIOUS TYPES

12  OF CONSTITUTIONAL ERROR. IT NOTED A COMMON THREAD IN

13  THOSE CASES IN WICH HARMLESS ERROR APPLIED TO ASSES

14  WHETER REVERSAL WAS REQUIRED: "EACH INVOLVED 'TRIAL

15  ERROR' — ERROR WICH OCURRED DURING THE PRESENTATION

16  OF THE CASE TO THE JURY, AND WICH MAY THEREFORE BE

17  QUANTITATIVELY ASSESSED IN THE CONTEXT OF OTHER

18  EVIDENCE PRESENTED IN ORDER TO DETERMINE WHETHER

19  ITS ADMISION WAS HARMLESS BEYOND A REASONABLE DOUBT."

20  (ID, AT PP. 307-308.) THIS TYPE OF ERROR IS ASSESED WITH

21  RESPECT TO ITS IMPACT ON THE FACT-FINDING PROCESS AT

22  TRIAL. (DELEWARE v. VAN ARSDALL (1986) 475 U.S. 673 [106

23  S. Ct. 1431, 89 L. Ed. 2d 674].

24      BY CONTRAST, WHERE THERE ARE "STRUCTURAL

25  DEFECTS IN THE CONSTITUTION OF THE TRIAL MECHANISM"

26  HARMLESS-ERROR REVIEW IS IMPOSIBLE.

27  (FULMINANTE, SUPRA, 499 U.S AT P. 309.)

28      THE HIGH COURT EXPLAINED:

(10)

1   EACH OF THIS CONSTITUTIONAL DEPRIVATIONS IS A SIMILAR
2   STRUCTURAL DEFECT AFFECTING THE FRAMEWORK WITHIN
3   WHICH THE TRIAL PROCEEDS, RATHER THAN SIMPLY AN
4   ERROR IN THE TRIAL PROCESS ITSELF." WITHOUT THESE
5   BASIC PROTECTIONS, A CRIMINAL TRIAL CANNOT
6   RELIABLY SERVE ITS FUNCTION AS A VEHICLE FOR
7   DETERMINATION OF GUILT OR INNOCENCE, AND NO
8   CRIMINAL PUNISHMENT MAY BE REGARDED AS
9   FUNDAMENTALLY FAIR."
10  (Id. at. P. 310, QUOTING ROSE V. CLARK (1986) 478 U.S. 570, 577-578
11  [106 S. Ct. 3101, 92 L. Ed. 2d 460]. THIS TYPE OF ERROR
12  NECESSARILY RENDERS THE TRIAL FUNDAMENTALLY UNFAIR.
13  (Rose, SUPRA, 478 U.S at P. 577.)
14      STRUCTURAL ERROR HAS BEEN IDENTIFIED IN A LIMITED
15  NUMBER OF SITUATIONS: LACK OF AN IMPARTIAL TRIAL JUDGE
16  (Tumey v. Ohio (1927) 273 U.S 510 [47 S. Ct. 437; 71 L. Ed. 749]).
17  TOTAL DEPRIVATION OF RIGHT TO COUNSEL (Gideon v. Wainwright
18  1963) 372 U.S. 335 [83 S. Ct. 792; 9 L. Ed. 2d 799]; DENIAL OF THE
19  RIGHT TO SELF REPRESENTATION (McCaskle v. Wiggins (1984)
20  465 U.S. 168 [104 S. Ct. 944; 79 L. Ed. 2d 122]); DENIAL OF
21  RIGHT TO PUBLIC TRIAL (Waller v. Georgia (1984) 467 U.S. 39
22  [104 S. Ct 2210; 81 L. Ed. 2d 31]); UNLAWFUL EXCLUSION OF
23  GRAND JURORS OF DEFENDANT'S RACE (Vasquez v. Hillery (1984)
24  474 U.S. 254 [106 S. Ct. 617; 88 L. Ed. 2d 598]); AND ERRONEOUS
25  REASONABLE - DOUBT INSTRUCTIONS (Sullivan v. Louisiana
26  (1993) 508 U.S. 275 [113 S. Ct. 2078; 124 L. Ed. 2d 182]).
27      THE ERROR HERE FITS THE LIST. THE TRIAL COURT'S
28  PRECLUSION OF JUROR INQUIRY IMPACTED THE STRUCTURE OF

(11)

1   DELIBERATION AND THERE IS NO WAY TO TELL WHETHER

2   THESE JURORS RENDERED A VERDICT WHILE HARBORING

3   QUESTIONS OR MISUNDERSTANDINGS ABOUT THE LAW

4   GOVERNING THIS CASE. THAT AMOUNTS TO A "STRUCTURAL

5   DEFECT IN THE TRIAL MECHANISM, WHICH DEF[IES] ANALYSIS

6   BY `HARMLESS-ERROR' STANDARDS." (FULMINANTE, SUPRA, 499

7   U.S. AT P. 309; SEE ALSO SULLIVAN, SUPRA, 508 U.S AT 279

8   [ERRORS WHICH DEFY HARMLESS ERROR ANALYSIS ARE

9   STRUCTURAL].) IT IS IMPOSSIBLE TO DETERMINE WHETHER

10  THE GUILTY VERDICT IN THIS CASE WAS SURELY

11  UNATTRIBUTABLE TO THE ERROR. (Ibid.) THE DEFECT IS

12  STRUCTURAL, AND THUS REQUIRES REVERSAL PER SE.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CLAIM III : SUPPORTING FACTS
## THE ERRONEOUS RECITATION OF CALJIC NOS. 1.22 AND 8.11 ON THE DEFINITION OF MALICE IN AN ATTEMPTED MURDER CASE IS NOT RENDERED HARMLESS THROUGH RECITATION OF CALJIC NO. 8.66 AND ARGUMENT OF THE PROSECUTION

THE COURT OF APPEAL HELD THAT THE TRIAL COURT'S RECITATION OF CALJICS NOS. 1.22 (DEFINING MALICE AS "A WISH TO VEX, ANNOY, OR INJURE ANOTHER PERSON, OR AN INTENT TO DO A WRONGFUL ACT") AND 8.11 (DEFINING MALICE IN TERMS OF "CONSCIOUS DISREGARD") WAS ERROR IN THIS, AN ATTEMPTED MURDER CASE REQUIRING THE SPECIFIC INTENT TO KILL. HOWEVER, IT FOUND THE ERROR TO BE HARMLESS BEYOND A REASONABLE DOUBT BY VIRTUE OF THE TRIAL COURT'S RECITATION OF CALJIC NO. 8.66 AND THE ARGUMENT OF THE PROSECUTION. (TO 15-16.) PETITIONER DISAGREES.

CALJIC NO. 1.22 AND CALJIC NO. 8.66 (PROPERLY DEFINING MALICE IN THE ATTEMPTED MURDER CONTEXT) WERE SIMPLY AT ODDS REGARDING THE DEFINITION OF MALICE. "A CONFLICT BETWEEN INSTRUCTIONS DOES NOT CLARIFY EITHER INSTRUCTION." (PEOPLE V. GUZMAN (1999) 73 CAL. APP. 4TH 103, 117.) THE UNITED STATES SUPREME COURT AGREES: "LANGUAGE THAT MERELY CONTRADICTS AND DOES NOT EXPLAIN A CONSTITUTIONALLY INFIRM INSTRUCTION WILL NOT SUFFICE

(1)

1    TO ABSOLVE THE INFIRMITY. A REVIEWING COURT HAS NOT A

2    WAY OF KNOWING WHICH OF THE TWO IRRECONCILABLE

3    INSTRUCTIONS THE JURY APPLIED IN REACHING THEIR VERDICT."

4    (FRANCIS V. FRANKLIN (1985) 471 U.S. 307, 322 [105 S. Ct. 1965, 85

5    L. Ed. 2d 344.) AS A RESULT, THERE REMAINS A "REASONABLE

6    LIKELIHOOD" THAT THE JURORS APPLIED THE INSTRUCTIONAL

7    LANGUAGE IN A MANNER CONTRARY TO LAW, AND SUCH AN

8    APPLICATION MUST BE ASSUMED TO HAVE OCCURRED (SEE

9    ESTELLE V. MCGUIRE (1991) 502 U.S. 62, 72 [112 S. Ct. 475, 116 L.

10    Ed. 2d 385] PEOPLE V. CLAIR (1992) 2 CAL. 4TH 629, 662 [SAME].

11      CALJIC NO. 8.11 WAS SIMILARLY AT ODDS WITH CALJIC

12    NO. 8.66 ON THE DEFINITION OF MALICE. IN PEOPLE V. LEE

13    (1987) 43 CAL. 3d 666, THE ALLEGED OFFENSE, AS HERE, WAS

14    ATTEMPTED MURDER, WHICH REQUIRES A SPECIFIC INTENT TO KILL.

15    THE TRIAL COURT IN LEE INSTRUCTED THE JURORS ON THIS

16    ELEMENT, BUT ALSO RECITED THE 'IMPLIED MALICE' [CONSCIOUS

17    DISREGARD FOR HUMAN LIFE] FORMULATION IN CALJIC NO. 8.11.

18    (ID. AT P. 673.) CONSIDERING THE OPPOSITION OF INSTRUCTIONS,

19    THE LEE COURT EXPLAINED THAT

20

21       CONFLICTING INSTRUCTIONS, WHICH APPEAR TO REQUIRE

22       A SPECIFIC INTENT TO KILL BUT WHICH ELIMINATE THAT

23       REQUIREMENT WHERE IMPLIED MALICE MALICE IS FOUND,

24       ARE CLOSELY AKIN TO INSTRUCTIONS WHICH

25       COMPLETELY REMOVE THE INTENT ISSUE FROM THE

26       JURY'S CONSIDERATION: IF THE IMPLIED MALICE

27       INSTRUCTIONS ARE FOLLOWED, THE ISSUE OF INTENT

28       MAY INDEED BE REMOVED FROM THE CASE

1  [VIOLATING FEDERAL DUE PROCESS].

2  (Id., at P. 674.) SIMILARLY, HERE, IF ONE OR MORE JURORS CHOSE

3  TO APPLY THE CALJIC No. 8.11 DEFINITION OF MALICE TO THE

4  ATTEMPTED MURDER CHARGE, THIS WOULD HAVE REMOVED THE

5  REQUISITE MENTAL STATE OF A SPECIFIC INTENT TO KILL.

6  (SEE ALSO PEOPLE V. MAURER (1995) 32 CAL. APP. 4TH 1121,

7  1228-1229 ["IF CONFLICTING INSTRUCTIONS ON THE MENTAL

8  STATE ELEMENT OF AN ALLEGED OFFENSE CAN ACT TO REMOVE

9  THAT ELEMENT FROM THE JURY'S CONSIDERATION, THE

10  INSTRUCTIONS CONSTITUTE A DENIAL OF FEDERAL DUE PROCESS

11  AND INVOKE THE CHAPMAN 'BEYOND A REASONABLE DOUBT'

12  STANDARD FOR ASSESSING PREJUDICE"].)

13      IN THE WORDS OF THE COURT IN PEOPLE V. GUITON (1993) 4

14  CAL. 4TH 1116, 1125-1126 THIS IS A CASE OF "LEGAL INSUFFICIENCY"

15  REQUIRING REVERSAL. (Id. AT P. 1128.) UNDER THE INSTRUCTIONS,

16  THE JURORS COULD HAVE HELD APPELANT   LIABLE FOR ATTEMPTED

17  MURDER BASED ON A FINDING THAT HE "INTENDED TO DO A

18  WRONGFUL ACT" AS PROVIDED FOR IN CALJIC No. 1.22 OR

19  HARBORED A "CONSCIOUS DISREGARD FOR HUMAN LIFE" AS

20  PROVIDED FOR IN CALJIC No. 8.11 — AS OPPOSED TO THE

21  REQUISITE SPECIFIC INTENT TO KILL. THE EVIDENCE ON THE

22  ISSUE OF INTENT WAS NOT OVERWHELMING AND, AS SUCH,

23  THERE REMAINED REASON TO HARBOR DOUBT THAT APPELLANT

24  INTENDED TO KILL STOLLWARTH.

25      AN EXAMINATION OF SHADE IS IN ORDER. THERE, THE COURT FOUND

26  THE ERROR HARMLESS BECAUSE THE EVIDENCE DID NOT SUPPORT A LESSER OFFENSE,

27  INDICATING THAT THE JURORS, IN FACT, EMPLOYED THE CORRECT DEFINITION

28  OF MALICE, (SHADE, SUPRA, 85 CAL. APP. 3d AT P. 715.)

(3)

IN CONTRAST, THE RECORD HERE PROVIDES NO SUCH INSIGHT INTO WICH STANDARD OF MALICE THE JURORS RELIED UPON IN CONVICTING PETITIONER OF ATTEMPTED MURDER. FIRST, THE EVIDENCE PLAINLY SUPPORTED CONVICTION ON THE LESSER OFFENSE OF ASSAULT WITH A FIREARM. NOT ONLY DID PETITIONER TELL THE POLICE AND TESTIFY TO THE EFFECT THAT HE DID NOT AIM THE GUN AT MARTINEZ AND ONLY INTENDED TO SCARE HER. (1 RT 234-236, 287, 305, 312.) PROSECUTION WITNESSES ALSO TESTIFIED THAT IN CONTRAST TO PETITIONER AIMING THE GUN FROM HIS SHOULDER WHEN HE "GESTURED" AT MARTINEZ, PETITIONER FIRED FROM THE RIBS OR HIP WHEN HE ACTUALLY FIRED THE GUN — A VOLITIONAL CHOICE TO EMPLOY A QUALITATIVELY LESS EFFECTIVE AIM. (1 RT 666-7, 93, 108, 112-113, 126, 132.) PETITIONER KNEW HOW TO BEST AIM THE GUN AND USED THAT TECHNIQUE WHILE NOT SHOOTING, BUT CHOSE NOT USE THE MOST ACCURATE AIM WHEN IT CAME TO PULLING THE TRIGGER. MOREOVER, A GLASS PANE SEPERATED PETITIONER FROM HIS VICTIM. (1 RT 68-69, 94-95, 109-110.) THERE WAS NO EVIDENCE THAT THE FIRST ROUND FIRED INTO THE GLASS FROM THIS RELATIVELY SMALL GAUGE GAGE RIFLE REMAINED EITHER ON COURSE OR WITH A POTENTIALLY FATAL VELOCITY ONCE IT STRUCK THE PANE OF GLASS. THUS, THERE WERE BOTH SUBJECTIVE AND OBJECTIVE BASES TO FIND PETITIONER DID NOT INTEND TO KILL OR CONSCIOUSLY DISREGARD A LETHAL RISK IN HIS CONDUCT. RATHER, HIS CONDUCT ARGUABLY AMOUNTED TO AN AGGRAVATED ASSAULT. SUBSTANTIAL EVIDENCE IN THIS

(4)

1  CASE — IN CONTRAST TO <u>SHADE</u> — SUPPORTED THE LESSER.

2  Indeed, THERE REMAINS THE OBJECTIVE FACT THAT THESE

3  JURORS FOUND PETITIONER NOT GUILTY OF ATTEMPTING TO KILL

4  GULICK — EVEN THOUGH HE STOOD NEARBY MARTINEZ FOR A

5  TIME AND PETITIONER  BRIEFLY POINTED THE GUN AT HIM

6  AFTER HE MOVED AWAY, AND EVEN THOUGH THE JURORS WERE

7  INSTRUCTED ON THE "KILL ZONE" THEORY OF LIABILITY. (CT 162,

8  207-2'6; 2 RT 481-484.) THE JURORS LIKELY DIFFERENTIATED

9  BETWEEN GULICK AND MARTINEZ IN ASSIGNING LIABILITY

10  BASED ON THE FACTS THAT (1) PETITIONER'S "HISTORY"

11  (INCLUDING A DIRECT THREAT OF HARM) SOLELY INVOLVED

12  MARTINEZ (1 RT 55-58); (2) PETITIONER'S FOCUS WAS

13  PRIMARILY DIRECTED AT MARTINEZ AND HIS GESTURES WITH THE

14  GUN WERE SOLELY DIRECTED AT HER  (1 RT 68-69, 94-95, 109-110);

15  (3) PETITIONER'S GUN WAS DIRECTED TOWARDS MARTINEZ'

16  POSITION WHEN HE FIRED THE SHOT — GULICK WAS ALLREADY

17  WALKING AWAY FROM HER (1 RT 67, 92, 102, 108); AND (4)

18  PETITIONER'S GUN WAS POINTED TOWARDS MARTINEZ'

19  POSITION WHEN HE TRIED TO FIRE A SECOND SHOT (BUT THERE

20  WAS NO BULLET IN LOADED IN THE CHAMBER) (1 RT 70-71, 97,

21  114, 130.) THOSE DISTINCTIONS RENDERED MARTINEZ A

22  GREATER VICTIM THAN GULICK IN THE JURORS' MINDS, BUT

23  THEY DID NOT DEMAND A FINDING THAT PETITIONER

24  HARBORED MALICE, PROPERLY DEFINED, FOR THE REASONS

25  STATED ABOVE. INSTEAD THEY REMAIN <u>CONSISTENT</u> WITH

26  A DELIBERATE AGGRAVATED ASSAULT OF MARTINEZ BOOTSTRAPPED

27  INTO A DELIBERATE ATTEMPTED MURDER BY VIRTUE OF

28  ERRONEOUS RECITATION OF CALJIC NOS. 1.22 AND 8.11.

(5)

As such, "we simply cannot tell from this record which theory the jury in fact adopted". (Green, supra, 27 Cal.3d at p.71.) That merits reversal under Green, Guiton, Griffin, and Suniga.

CLAIM I

C.T ᴾᴬᴳᴱˢ 93, 192-193, 159
187, 190, 191

000093

FILED
PRIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

MAR 22 2005

1  GROVER TRASK
2  District Attorney                        Arraign: 3/24/05
3  County of Riverside                      S204
4  30755-D Auld Road
5  Murrieta, California 92563
6  Telephone: (951) 304-5400
7
8  ORIGINAL
9                    SUPERIOR COURT OF CALIFORNIA
10                        COUNTY OF RIVERSIDE
11                            (Southwest)
12
13  THE PEOPLE OF THE STATE OF CALIFORNIA,     NO. SWF009113
14                              Plaintiff,
15                  v.                          INFORMATION
16
17  VINCENTE ALVAREZ ARRAIGA                    AGENCY#: PE04278099/RSDP
18  AKA:  VINCENTE ALEJANDRO ARRIAGA
19
20                              Defendant.
21
22                          COUNT 1
23      The District Attorney of the County of Riverside hereby accuses VINCENTE
24  ALVAREZ ARRAIGA of a violation of Penal Code section 664/187, subdivision (a), a felony,
25  in that on or about October 4, 2004, in the County of Riverside, State of California, he did
26  wilfully, unlawfully, and with malice aforethought attempt the willful, deliberate and
27  premeditated murder of LISA MARTINEZ, a human being.
28      The District Attorney of the County of Riverside further charges that the commission
29  and attempted commission of the offense hereinabove set forth in count 1 of the information,
30  the defendant, VINCENTE ALVAREZ ARRAIGA, was a principal and at least one principal
31  personally and intentionally discharged a firearm, within the meaning of Penal Code sections
32  12022.53, subdivision (c), and subdivision (e), subsection (1).
33  ///
34  ///
35  ///
36  ///

GROVER TRASK
DISTRICT ATTORNEY
County of Riverside
State of California                              1

000192

**CALJIC 17.11**

CONVICTION OF LESSER DEGREE

If you find the defendant guilty of the crime of _PC 664/187(a)_, but have a reasonable doubt as to whether it is of the first or second degree, you must find [him/████] guilty of that crime in the second degree.

65

Jury Instruction

000193



**CALJIC 8.20**

DELIBERATE AND PREMEDITATED MURDER

a.)    All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree.

The word "willful," as used in this instruction, means intentional.

The word "deliberate" means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. The word "premeditated" means considered beforehand.

If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree.

The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances.

The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation as will fix an unlawful killing as murder of the first degree.

To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, [he] [▊▊▊▊] decides to and does ⬤ ATTEMPT TO KILL.

a.)    ATTEMPTED

⤬ 66

Jury Instruction

000159

**CALJIC 3.30**

CONCURRENCE OF ACT AND GENERAL CRIMINAL INTENT

In the crime ███ _____ , _____ , ████████████ charged in Count[s] **2**
_____ , _____ , ███████ ████████ ,] [and the crime ███ of  **a.)**
_____ , _____ , ] ███████████ (on) _____ ,] there must exist a
union or joint operation of act or conduct and general criminal intent. General criminal intent
does not require an intent to violate the law. When a person intentionally does that which the law
declares to be a crime, [he] ████ is acting with general criminal intent, even though [he] [or]
██] may not know that [his] ████ act or conduct is unlawful.

a.) PC 148(a)(1), RESISTING ARREST

b.) AND IN the CRIME oF
PC 245(a)(2), ASSAULT with a FIREARM

which is A LESSER CRIME to the CRIMES
CHARGED IN Counts 1 AND 3, PC 664/187(a)

000187

**CALJIC 4.21.1**

VOLUNTARY INTOXICATION--TRIAL WITH GENERAL AND SPECIFIC INTENT
CRIMES

It is the general rule that no act committed by a person while in a state of voluntary intoxication is less criminal by reason of that condition.

Thus, in the crime[ ] of _PC69 Resisting Arrest_ charged in Count[ ] _2_, [or the crime of _PC148(a)(1), misdemeanor_ ~~Resisting Arrest~~ which is lesser thereto,] the fact that the defendant was voluntarily intoxicated is not a defense and does not relieve defendant of responsibility for the crime. This rule applies in this case only to the crime[ ] of _PC 69_ [.][, and the lesser crime[ ] of _PC148(a)(1)_ ] _&app to the lesser crime of PC245(a)(2)_

However, there is an exception to this general rule, namely, where a [specific intent] [▓▓▓▓▓▓] is an essential element of a crime. In that event, you should consider the defendant's voluntary intoxication in deciding whether the defendant possessed the required [specific intent] [▓▓▓▓▓▓] at the time of the commission of the alleged crime.

Thus, in the crime[s] of _____ (i.) _____, _____,] a necessary element is the existence in the mind of the defendant of [a] certain [specific intent[ ] ] [▓▓▓▓▓▓▓] which is included in the definition of the crime[s] set forth elsewhere in these instructions.

If the evidence shows that a defendant was intoxicated at the time of the alleged crime, you should consider that fact in deciding whether or not ▓▓▓ defendant had the required [specific intent] [▓▓▓

If from all the evidence you have a reasonable doubt whether a defendant had the required [specific intent] [▓▓▓▓▓▓ you must find that defendant did not have that [specific intent] [▓▓▓▓▓

a) _App to the crime of PC245(a)(2), Assault with a firearm, which is a lesser crime to the crimes charged in counts 1 & 3;_

b) _PC 664/187(a), charged in counts 1 & 3, and PC664/ 211, charged in count 4, and PC459, charged in counts, or the crime of PC 664/187(a) attempted murder, non-willful non-deliberate non-premeditated, which is a lesser crime to the crime charged in count 1 & count 3_

000190

**CALJIC 17.10**

CONVICTION OF LESSER INCLUDED OR LESSER RELATED OFFENSE-- IMPLIED
ACQUITTAL--FIRST

If you are not satisfied beyond a reasonable doubt that the defendant is guilty of the crime charged, you may nevertheless convict [him■] of any lesser crime, if you are convinced beyond a reasonable doubt that the defendant is guilty of the lesser crime.

a)

Thus, you are to determine whether [the] defendant [is] [■] guilty or not guilty of the crime[s] charged [■■■] or of any lesser crime[s]. In doing so, you have discretion to choose the order in which you evaluate each crime and consider the evidence pertaining to it. You may find it productive to consider and reach a tentative conclusion on all charges and lesser crimes before reaching any final verdict[s]. However, the court cannot accept a guilty verdict on a lesser crime unless you have unanimously found the defendant not guilty of the [charged] ■■ crime.

a) THE CRIME OF PC 664/187(a) ATTEMPTED MURDER,
NON-WILLFUL, NON-DELIBERATE
NON-PREMEDITATED, IS LESSER TO
THE CRIMES CHARGED IN COUNT 1
AND COUNT 3, PC 664/187(a)
ATTEMPTED WILLFUL, DELIBERATE AND
PREMEDITATED MURDER

the CRIME OF PC 148(a)(1) MISDEMEANOR RESISTING
ARREST, IS LESSER TO THE CRIME CHARGED
IN COUNT 2, PC 69 RESISTING ARREST.

the CRIME OF PC 245(a)(2) ASSAULT WITH A FIREARM,
IS A LESSER TO THE CRIMES CHARGED IN
COUNTS 1 AND 3, ATTEMPTED MURDER

Jury Instruction
63

000191

**CALJIC 17.49**

USE OF MULTIPLE VERDICT FORMS--IMPLIED ACQUITTAL-FIRST

[In this case, the defendant has been charged with _____ a.) ▓▓▓▓, [▓▓▓▓▓▓▓▓▓. The foregoing charged crime[s] include[s] the lesser offenses , of ___ ▓▓▓▓▓▓▓▓▓▓▓▓. b.) You will be given [_____] verdict forms encompassing both the charged crime[s] and the lesser included offense[s].

Since the lesser offense[s] [● [are] included in the greater, you are instructed that if you find the defendant guilty of the greater offense[s], you should not complete the verdict[s] on the corresponding lesser offense[s] and ▓▓ [those] verdict[s] should be returned to the Court unsigned by the Foreperson.

If you find the defendant not guilty of ▓▓▓▓▓▓ a.) ▓▓▓▓, you then need to complete the verdict[s] on the lesser included offense[s] by determining whether the defendant is guilty or not guilty of the lesser included crime[s], and the corresponding verdict[s] should be completed and returned to the Court signed by the Foreperson.

a.) PC 664/187(a), Attempted Willful, Deliberate,
Premeditated Murder, in Count 1
And in Count 3, Each A Felony, And
PC 69, Resisting Arrest, in Count 2, A Felony

b.) * PC 664/187(a), Attempted Willfully
Non-Deliberate, Non Premeditated
Murder, A Felony, Lessens to Counts 1 and 3

And
PC 245(a)(2), Assault With A Firearm, Lessens to
Counts 1 & 3,

And PC 148(a)(1), Misdemeanor Resisting Arrest, Lessens to Count 2.

_____
X 64
Jury Instruction

CLAIM II

I RT PAGES 320 AND 321

CLAIM III

I RT PAGES 55-58

1    A    He was wearing some, I believe it was, black pants,

2    jean type, I think, and a black jacket with no shirt.  Or it

3    was unzipped.  And that was it.

4    Q    So he comes up to your register.  I assume, as your

5    employee position, you attempt to help him as a customer;

6    correct?

7    A    I did.  He stood there for a minute, and he didn't

8    say anything, and he didn't have anything in his hands.

9    Q    What did you say or do?

10    A    I asked him, "How can I help you?"

11    Q    What happened next?

12    A    He had his head down, and he mumbled at first.  And

13    I didn't think I heard what I thought I heard.

14    Q    What did you say?

15    A    I asked him again.  And then, like, I -- I didn't

16    think what I heard.  So when I asked him again, he repeated

17    it.

18    Q    What did the defendant say to you?

19    A    He said, "Give me your fucking money."

20    Q    Was it -- what type of tone was it?

21    A    Angry.

22    Q    Like, "Give me your fucking money"?

23    A    Yes.

24    Q    Did you -- did you grasp what was going on at this

25    point?

26    A    At first, no, because we have so many people that

27    come in the store and joke like that all the time.  And then

28    when I looked at him, I saw his eyebrow go up and saw that his

55

1  face tensed up.

2      Q    And did he say it again?

3      A    Yes.

4      Q    What did he say again?

5      A    He said it again.  He said, "Give me your fucking

6  money."

7      Q    What did you say?

8      A    I said "No, dawg, I'm not giving you the money."

9      Q    Shut him down?

10     A    Yes.

11     Q    What did he say?

12     A    He said, "If you don't give me the fucking money

13  right now, I'm gonna hurt you."

14     Q    What happened next?

15     A    He attempted to lean forward on the turntable that

16  we have the bags on and, like, twitched when he went to lean

17  forward.  So I thought that he was gonna lunge at me or hit me

18  or something.  So then I turned around -- no, excuse me, I

19  take that back.  I had asked him was he serious at first.  And

20  when I asked him if he was serious, he said "Yes."  And I

21  says, "Are you serious, with all the security that we have in

22  here?"

23          MS. CHA:  Objection, narrative, no question pending.

24          THE COURT:  Sustained.

25     Q    (BY MR. GALLON):  So you asked him if he was

26  serious?

27     A    Yes.

28     Q    And you said something, what about security?

56

```
 1      A     I said, "With all the security we have in here?"

 2      Q     And what was his response?

 3      A     He -- that's when he said "Yes."

 4      Q     Okay.  And that's after that that he said, "If you

 5   don't give me the money, I'm gonna hurt you?"

 6      A     Yes.

 7      Q     So at some point did you leave that register?

 8      A     That's when he leaned forward, and then that's when

 9   I thought that he was gonna hit me or something.  So then I

10   just turned and I left my register.  And I leaned back to look

11   over my shoulder --

12            MS. CHA:  Objection, narrative.

13            THE COURT:  Yeah.  I'm going to -- sometimes it's

14   real easy to anticipate follow-up questions, what they might

15   be.  You know, you kind of go along a certain format.  But we

16   have to do this by a specific question and a response to that

17   question, only without adding what you think might be

18   appropriate to add.  And this lets Counsel ask what Counsel

19   believes is the next appropriate question.  And I think

20   Counsel is correct that you are getting ahead of yourself.

21            THE WITNESS:  Okay.

22            THE COURT:  So I will request that you just listen

23   to the question and just respond as specifically as possible

24   to only what is asked.

25            THE WITNESS:  Okay.

26            THE COURT:  And then there will be something

27   following, maybe.

28            Counsel, you may proceed.
```

57

1          MR. GALLON:  Thank you, your Honor.

2     Q    (BY MR. GALLON):  So as you were saying, you walked

3 away from the register, and you kind of looked over your

4 shoulder?

5     A    Yes.

6     Q    And what did he do?

7     A    He turned and walked away.

8     Q    Did he leave the store?

9     A    Yes.

10    Q    I showed you this morning in the office this

11 videotape that's been marked as People's 22?

12    A    Uh-huh.

13    Q    Did you have an opportunity to take a look at the

14 video?

15    A    Yes.

16    Q    And you saw the three different scenes that were

17 depicted in this video?

18    A    Yes.

19    Q    Now, your store does maintain a surveillance system?

20    A    Yes.

21    Q    And you witnessed the three scenes on this.  Does

22 this video show exactly what you witnessed personally?

23    A    Yes.

24    Q    I would like to direct your attention to People's --

25 or People's 22.

26         With permission of the Court I'd like to play the

27 videotape.

28               (Videotape playing.)                          58

1    jurors does not mean that you ignore your common life
2    experience in determining and evaluating or deciding what did
3    or did not occur.

4         I will read the jury instructions to you.  Won't
5    happen today.  It will happen tomorrow.  You will be given a
6    copy of the instructions when you start deliberating.

7         You are bound to follow the jury instructions,
8    although one of the instructions does state that you might not
9    find that they all necessarily apply, depending upon what you
10   determine the facts to be.

11        Not every concept, not every situation, not every
12   word usage, not every possibility is necessarily included in
13   the instructions.  What does that mean?  Let's say you were a
14   juror and we're talking about an incident that occurred during
15   a light drizzle.  Something happens during a light drizzle.
16   And now you're looking for a jury instruction defining "light
17   drizzle."  There is no such thing.  Okay?  So that means not
18   every possibility, not every word usage, not every situation
19   will be included in the jury instructions.

20        If you have a question regarding the jury
21   instructions, you can make a request of us.  You will be given
22   forms that you fill out.  And if you have a request regarding
23   anything, we just request that you be as specific as possible
24   as to what the request is.

25        Sometimes jurors have a request regarding the jury
26   instructions.  They would like us to define some words in the
27   instructions, they would like to have the instruction
28   explained a little differently, or they would request that we

320

1   provide an instruction that assists the jurors in
2   understanding the instruction in question.  When that happens,
3   generally our response is, "Reread the instruction."  So the
4   likelihood, the odds of us giving you some more, further
5   instructions after the initial packet that will be read to
6   you, pretty remote.  Probably is not going to happen.  So if
7   you do have a question regarding the wording itself, we just
8   request you read it, reread that instruction in light of all
9   the instructions surrounding it, or all the other ones that
10  might pertain to that particular issue.

11       You do have a request for readback -- you have a
12  right to request a readback.  I hate to tell you this, but
13  theoretically you have a right to have the reporter read back
14  everything, all the testimony, every witness.  Normally that
15  serves no useful purpose.  So if you do have a request for
16  something to be read back, the testimony of a witness, again,
17  we request that you be as specific as possible.  Explain
18  exactly what you're looking for.  It might take the reporter a
19  little while to find this.  And then in looking for this and
20  providing the response to you, just keep on keeping on.  Keep,
21  you know, reviewing the case, discussing the case.

22       You are to decide the case by what you believe was
23  proven or not proven by the evidence, together with applying
24  the appropriate jury instructions that apply to this case.

25       I think what we will do, we will start you a little
26  bit later tomorrow.  I'm going to have you come in at
27  10:00 o'clock tomorrow.  Okay?  And what's going to happen, I
28  will instruct you as to the law.  My guess is it might take

321

CLAIM III

I RT PAGES 67, 92, 102

AND 108

1    A    Could have been pointing at Larry.  We're both right

2    there.

3    Q    You guys are right there?

4    A    Yes.

5    Q    How far away was he from you, if you could tell?

6    Tell me to back up or whatever, or go --

7    A    Come forward, please.

8         About right there.

9    Q    Is this about how far he was away from you?

10   A    Yes, I believe so.

11        MR. GALLON:  What does this look, your Honor?

12        THE COURT:  For the record, 12 to 15 feet?  Do both

13   Counsel agree that's pretty close?

14        MR. GALLON:  About 15, I think.

15        THE COURT:  Rough guess.

16        MS. CHA:  Yes, your Honor.

17        THE COURT:  Okay.

18   Q    (BY MR. GALLON):  He's pointing the gun at you?

19   A    Yes.

20   Q    What do you see happen?

21   A    The glass break.

22   Q    What happens next?

23   A    I ducked down behind the podium, and Larry went over

24   by the tag machine.

25   Q    Is that over to the right?

26   A    The tag machine is off to the side over here.

27   Q    Would that be over on this side where I'm pointing

28   my pen right now?

67

1   at you, do you remember how long it was the gun was up before

2   the glass shattered?

3       A    No.

4       Q    Now, you saw the picture -- I mean the video, so you

5   know the gun went up, and he switched over and held the gun in

6   front of him and shot; do you remember that at all?  Do you

7   remember that happening from that night?

8       A    All I remember is that it was pointing at me and the

9   glass shattered.

10      Q    When the gun went up and it pointed at you, did you

11  immediately duck, or did you wait until the glass shattered?

12      A    I don't remember.

13      Q    So you don't remember if -- you don't remember if it

14  shatters and then you go down, or if you went down first and

15  then shatter?

16      A    I don't remember.

17      Q    You don't remember that?

18      A    No.

19      Q    So -- but you are sure that you didn't hear

20  anything, you just saw the gun and you went down?

21      A    Yes.

22      Q    Well, you see the gun go up, and then you go down;

23  do you remember how many seconds before you heard any kind of

24  noise at all, or there was constant noise?

25      A    We have noise behind us, because all the people were

26  there and they knew what was going on.

27      Q    When the gun went up, do you know, do you remember

28  if Larry went running immediately, or if he was still with you

92

1    Because I just want to show it to you real quickly again.

2    This is after the first shot outside.  And I know it's bad

3    quality.  That's you behind the podium right there; correct?

4         A    Yes.

5         Q    And you're watching him.  Now, Larry is standing

6    over to your right, and now the shot goes off, you're ducking

7    down behind the podium there; correct?

8         A    Yes.

9         Q    And you're standing there.  You've got your back to

10   him, and then he's blocking your view; where do you go after

11   this?

12        A    Over there in that corner between the registers.

13        Q    Where is that?

14        A    Between one and two and the parts.

15        Q    Is that up here?

16        A    Yes, but there's a whole part in between that that's

17   not shown on that.

18        Q    Okay.

19             MR. GALLON:  Your Honor, can we adjourn?

20             THE COURT:  Do you have more than just a couple

21   minutes of the witness?

22             MR. GALLON:  Actually, no.  I'm actually done with

23   this witness right now.

24             THE COURT:  Okay.  Anything further?

25             MS. CHA:  No, your Honor.

26             THE COURT:  Okay.  With that in mind, Ms. Martinez,

27   you are excused, free to leave.  You are to not discuss your

28   testimony with any other witness.  You are subject to recall,    102

1   face is from there she was behind the podium.  I was standing

2   to her right.

3        Q    Okay.  So she's here, and you're to the right a

4   little bit?

5        A    Correct.

6        Q    Okay.  The person that you saw outside, what did you

7   notice?

8        A    He walked up to the front, he was just onto the

9   sidewalk.  At that point he raised a rifle up at the direction

10  of where we were standing.  As I saw the rifle come up, I

11  started heading in one direction, and Lisa ducked down behind

12  the podium.  At that point I was maybe a step or two away from

13  her when I was still looking at him, and he fired a shot

14  through the glass.

15       Q    When he fired a shot through the glass, where -- you

16  took off running when he shot; correct?

17       A    Yes.

18       Q    And where in this picture did you go?

19       A    You can't see it.  It's just off of -- this is the

20  automatic door.  To the left of that picture there's a manual

21  door, and then there's a pet i.d. tag machine that sits with

22  -- up against the brick wall that's right there.  I was right

23  at the edge of that.

24       Q    Okay.  After that did you see where this person

25  went?

26       A    Once the shot happened, the automatic doors opened

27  up, and he came into the vestibule.

28       Q    And that's the area between the two sets of doors?

108

CLAIM III

2 RT PAGES 66-67, 93, 108
112, 113, 126
AND 132

1  face is from there she was behind the podium.  I was standing
2  to her right.
3      Q    Okay.  So she's here, and you're to the right a
4  little bit?
5      A    Correct.
6      Q    Okay.  The person that you saw outside, what did you
7  notice?
8      A    He walked up to the front, he was just onto the
9  sidewalk.  At that point he raised a rifle up at the direction
10 of where we were standing.  As I saw the rifle come up, I
11 started heading in one direction, and Lisa ducked down behind
12 the podium.  At that point I was maybe a step or two away from
13 her when I was still looking at him, and he fired a shot
14 through the glass.
15     Q    When he fired a shot through the glass, where -- you
16 took off running when he shot; correct?
17     A    Yes.
18     Q    And where in this picture did you go?
19     A    You can't see it.  It's just off of -- this is the
20 automatic door.  To the left of that picture there's a manual
21 door, and then there's a pet i.d. tag machine that sits with
22 -- up against the brick wall that's right there.  I was right
23 at the edge of that.
24     Q    Okay.  After that did you see where this person
25 went?
26     A    Once the shot happened, the automatic doors opened
27 up, and he came into the vestibule.
28     Q    And that's the area between the two sets of doors?

108

1    A    Could have been pointing at Larry. We're both right

2  there.

3    Q    You guys are right there?

4    A    Yes.

5    Q    How far away was he from you, if you could tell?

6  Tell me to back up or whatever, or go --

7    A    Come forward, please.

8         About right there.

9    Q    Is this about how far he was away from you?

10   A    Yes, I believe so.

11        MR. GALLON:  What does this look, your Honor?

12        THE COURT:  For the record, 12 to 15 feet?  Do both

13 Counsel agree that's pretty close?

14        MR. GALLON:  About 15, I think.

15        THE COURT:  Rough guess.

16        MS. CHA:  Yes, your Honor.

17        THE COURT:  Okay.

18   Q    (BY MR. GALLON):  He's pointing the gun at you?

19   A    Yes.

20   Q    What do you see happen?

21   A    The glass break.

22   Q    What happens next?

23   A    I ducked down behind the podium, and Larry went over

24 by the tag machine.

25   Q    Is that over to the right?

26   A    The tag machine is off to the side over here.

27   Q    Would that be over on this side where I'm pointing

28 my pen right now?

1    A    Yes.

2    Q    Okay.  As you're looking out the door, do you ever

3  see the defendant again?

4    A    Yes.

5    Q    What do you see?

6    A    He walked up to the doors.

7    Q    And again, there's two sets of doors; correct?

8    A    Yes.

9    Q    Is it, I guess, similar to how we have in the

10  courtroom here?

11   A    Yes.

12   Q    Except they're both glass and a lot wider; correct?

13   A    Yes.

14   Q    So he's outside of the first set of doors or the

15  second set of doors?

16   A    The second set.

17   Q    So there's kind of, like, a sidewalk out there?

18   A    Yes.

19   Q    Before you get to the parking lot?

20   A    Yes.

21   Q    What, if anything, do you see outside these doors?

22   A    Him standing there and pointing the gun.

23   Q    Who's he pointing it at?

24   A    He's pointing it in.  I thought he was pointing it

25  at me.

26   Q    Was it pointing at you?

27   A    Yes.

28   Q    Okay.  So it was pointing at you?

66

1 and waiting until the glass shattered?

2     A    I didn't pay attention.

3     Q    Did the whole -- the door has two panes; right, one

4 on top and one on bottom; right?

5     A    It actually has three.  I just looked at them last

6 night.

7     Q    So they have three panes?

8     A    Yes.

9     Q    One on the top?

10     A    One large, one on the top, two small ones on the

11 bottom.

12     Q    Did the one on the top shatter?

13     A    Yes.

14     Q    How about the ones on the bottom?

15     A    No.

16     Q    So it's not that the whole thing shattered, it's

17 just the top shattered?

18     A    Yes.

19     Q    Do you know if the -- when the glass shattered if it

20 fell outside or if it fell inward?

21     A    Both.

22     Q    Both?  And that's something that you observed later;

23 is that correct?

24     A    Yes.

25     Q    Now, I think it was Exhibit 8 which is the one that

26 shows the podium.  In regards to a dog tag, can you see the

27 dog tags from this angle?  Or the dog tag machine, I'm sorry.

28     A    No.

1      A      Probably ten feet inside, ten feet from the

2   vestibule, and as you see right up against it, so maybe

3   another three feet.  So 20, 25 feet probably.

4      Q      So from me to you, how far?

5      A      About right there.

6      Q      Okay.  So he is right here?

7      A      Yes.

8      Q      And he is pointing the gun right at you guys?

9      A      Yes.

10      Q      And you can see on other portions of the video, you

11   are both pretty much standing there; correct?

12      A      Correct.

13      Q      From this far away he is pointing the gun right at

14   you, too?

15      A      Correct.

16      Q      How far are you away from Lisa?

17      A      Probably two or three feet.  I could reach out and

18   touch her with my left hand if I had to.

19      Q      And when that shot fired, where did Lisa go?

20      A      She was dropping down behind the podium as I was

21   heading off to the other direction, to the right, over by the

22   pet i.d. machine.

23      Q      And you are familiar with guns?

24      A      Yes, I am.

25      Q      In what manner are you familiar with guns?

26      A      I've hunted since I was about ten years old,

27   everything, rabbits, deer, birds.

28      Q      Have you used guns your whole life?

112

1     A    Yes, I have.

2     Q    You are familiar with guns, rifles?

3     A    Yes, I am.

4     Q    You know how to hold a rifle?

5     A    Yes, I do.

6     Q    Do you know the difference between someone pointing

7 a gun at someone and not pointing the gun at someone?

8     A    Yes, I do.

9     Q    Was that gun pointed at you guys?

10    A    Yes, it was.

11    Q    Wasn't off to the side or anything?

12    A    No.

13    Q    It was pointed right at you?

14    A    Right at us.

15    Q    And did that gun discharge?

16    A    Yes, it did.

17    Q    Can a 22 -- did you know it's a 22?

18    A    At the time I didn't, no.

19    Q    Did you see anything that would show you that it was

20 a 22?

21    A    Afterwards, yes, we found spent shell casings plus a

22 live round that was there in the vestibule.

23    Q    What kind of rounds were they?

24    A    From a 22 rifle.

25    Q    Can a 22 kill you?

26    A    Yes, it can.

27    Q    When he came inside that store after firing the

28 shot, and he is now inside the vestibule, and he's trying to

113

1  shoulder?

2      A    Correct.

3      Q    That's not the one where the shot actually came -- I

4  don't know if you understand what I am saying -- isn't the one

5  where he pulls the trigger; is that right?

6      A    That would be when he shot the glass out, yes.

7      Q    Well, I want to show you a different shot.  And I

8  think you can probably see it better in the video.  And that's

9  this one here.  This is a different position, where he is just

10  holding the gun out.

11      A    Okay.

12      Q    Do you remember that one being the one that he shot

13  the window?

14      A    Yeah, with the right hand out, correct.

15      Q    Okay.  So that's the one where the shot came from,

16  not this -- I'm sorry.  This would be the third one in

17  sequence.  I'm sorry.  It's kind of all jumbled together, but

18  -- so it's actually not the one where he holds it up to his

19  shoulder; is that correct?

20      A    That's correct.

21      Q    So when the D.A. was saying that -- that would be a

22  better aim -- well, as a gunman who's shot a gun before, that

23  would be where you're aiming at something; is that right?

24      A    That's correct.

25      Q    And then this position here, it would be a harder

26  aim if you are just holding the gun out or just shooting it?

27      A    It would be a very difficult aim, yes.

28      Q    Okay.  So as a gunman -- I'm sorry, I don't mean to

126

1    Q    (BY MR. GALLON):  What she asked you about what

2  would a proper hunter do, or what would be the preferred

3  method to do it, can you still fire a gun by holding it out

4  like that?

5    A    Yes.

6    Q    Will it still hit its target?

7    A    Yes.

8    Q    And do you see any difference between these two

9  poses and the direction in which that gun was fired?

10        MS. CHA:  Objection, foundation, speculation.

11        THE COURT:  Overruled.

12        If you believe you could express an opinion based

13  upon the experience in the photographs, you may do so.

14        THE WITNESS:  Just in looking at it, the top left

15  photo when he's aiming is farther aimed left, then it goes

16  from this one to this one as he steps closer, the three

17  series.  And then this one is back a little more to the right,

18  which would be more towards the podium.

19    Q    (BY MR. GALLON):  Towards Lisa Martinez?

20    A    Correct.

21    Q    So he's going back and forth between you two, maybe.

22  But what I'm asking you is, looking down the barrel of both of

23  these shots right here, especially the one in which he

24  discharged that weapon, who was in the line of fire?

25    A    Lisa Martinez was.

26    Q    Okay.  And how far were you from her?

27    A    Originally I was standing, like I said, with -- an

28  arm's length away.  And when the gun came up, we split.

132

CLAIM III

I RT PAGES 68-69, 94-95 109-110.

1      A    Yes.

2      Q    Okay.  And the -- so you're ducking down now behind

3  the podium?

4      A    Yes.

5      Q    And when that glass broke, was he still pointing the

6  rifle in your direction?

7      A    Yes.

8      Q    When -- after that glass broke, what happened?

9      A    He stepped into the vestibule because the doors

10  opened.

11     Q    And the vestibule is the area between the two sets

12  of doors; correct?

13     A    Yes.

14     Q    So that's actually inside the structure now?

15     A    Yeah.  Like, if you came in between there.

16     Q    Okay.  And once he came inside, what did he do?

17     A    He pointed it again at me.

18     Q    So he had already pointed the gun at you, discharged

19  the weapon, stepped inside, and is now pointing the gun at you

20  again?

21     A    Yes.

22     Q    And what, if anything, is he doing or anything with

23  that weapon?

24     A    He's following me when I would move.

25     Q    Okay.  Is he doing anything, like lifting up with

26  the gun or anything?

27     A    Yeah.  He's motioning for me to get up.

28         THE COURT:  For the record, the witness had her

68

1  hands out extended, and almost holding a pistol, but clasped

2  together --

3         THE WITNESS:  No, he had it like this.

4         THE COURT:  Okay.  Moving left arm with the right

5  arm -- right hand against the left arm, by the wrist, kind of

6  moving her arm up and down.

7         MR. GALLON:  Okay.

8     Q    (BY MR. GALLON):  And are you still back here behind

9  this podium?

10    A    Yes.

11    Q    Is he looking right at you?

12    A    Yes. He's mumbling things, too.

13    Q    Like what?

14    A    I believe he was calling me a bitch.

15    Q    What, if anything, happened after that?

16    A    He kept doing this and moving wherever I would move.

17  Like, I'd try to move this way, he would follow me.  If I went

18  this way, he'd follow me.  And --

19         THE COURT:  And for the record, the witness, as she

20  was stating, "He's doing this, doing this, following me,"

21  moved her extended left arm with her right hand resting

22  against the left arm back and forth.

23    Q    (BY MR. GALLON):  And then what happened next?

24    A    I had asked Larry what are we gonna do if he comes

25  through those doors when I was ducked down.

26    Q    Did you think you were gonna die?

27    A    Yeah.

28         MS. CHA:  Objection, leading.

69

1    Q    So if the person is standing at the door like this,

2    the dog tag machine is actually out of view; is that correct?

3    A    Looking at it from that way, yes.

4    Q    And are these the doors that you're saying that

5    Mr. Alvarez was standing in front of?

6    A    Yes.

7    Q    Since this instance do you know if the dog tag

8    machine has been replaced?

9    A    No.  It's still there.

10   Q    Still there?  Okay.  Now, when you said that

11   Mr. Alvarez walked up to the door and was pointing the gun at

12   you, do you remember how long you and Mr. Alvarez were there

13   for?

14   A    No.

15   Q    You can't estimate time at this point?

16   A    Everything seemed like forever.

17   Q    Now, you at this point, when he is standing there

18   with the gun, are you still ducked down?

19   A    Partially, yes.

20   Q    You said that he made movement with his -- with the

21   gun?

22   A    Yes.

23   Q    And the movements were kind of, like, for you to get

24   up?

25   A    Yes.

26   Q    Did you understand it to mean that he wanted you to

27   get up?

28   A    Yes.

94

1    Q    You couldn't tell what he was saying or hear what he

2  was saying; is that right?

3    A    No, I could just see his mouth moving.

4    Q    Do you remember how long this went for?

5    A    Like I said, it seemed like forever.

6    Q    Now, you said that he would follow you as you're

7  moving, and you made a motion of going to the right, going to

8  the left; was this all done behind the podium?

9    A    Yes.

10   Q    At any point in time did you actually stand up so he

11 could see you?

12   A    No, I didn't stand up until the end.

13   Q    I'm sorry?

14   A    I didn't stand up until the end when I asked Larry a

15 question.

16   Q    So then when you said that he was following you with

17 a gun as you're moving, you're moving behind the podium; is

18 that correct?

19   A    Yes.

20   Q    So he's in front of the podium, or actually behind

21 the doors trying to see behind the podium?  How was he

22 following you if you're behind the podium?

23   A    Because I was partially up.

24   Q    Do you remember what part of your body was up?

25   A    About this high.

26   Q    So you're actually standing above the podium?

27   A    Not all the way up.

28        THE COURT:  For the record you pointed where?

95

1    A    That's correct.

2    Q    Did you see what he was doing at that time?

3    A    He brought the gun up with his right hand and

4 started over towards where I was at.  And then he looked back

5 over to where Lisa was at behind the podium and was trying to,

6 like, motion her to stand up.  She was down behind the podium.

7    Q    Now, let me show you -- real quickly I'd like to

8 show you a portion of the videotape.  And the videotape,

9 you've seen it; correct?

10    A    Yes, I have.

11    Q    You have also seen -- is that the original videotape

12 that we have?

13    A    No.

14    Q    You have seen another portion of the video; correct?

15    A    There is actually two separate videos that were

16 pulled and retained that night by the police officer.

17    Q    That is the multiplex --

18    A    That's correct, one off of two different

19 multiplexers.

20    Q    Okay.  You've seen that video, and you've seen this

21 one, correct, the one that we have in court today?

22    A    Yes.

23    Q    Let me show you -- with permission of the Court I'd

24 like to play the video.

25        THE COURT:  You may.

26    Q    (BY MR. GALLON):  You've seen this portion of the

27 video; correct?

28    A    Yes, I have.                                    109

1    Q    It's hard to see behind the podium right now in this

2    picture.  But are you -- during this portion where he is in

3    there, where is Lisa?

4    A    Behind the podium -- well, behind the podium, and

5    I'm behind the pet i.d. machine over on the far left.

6    Q    Okay.  Now, the portion -- in whose direction was he

7    pointing that rifle when he entered that vestibule?

8    A    Originally he was aiming to the left over by where I

9    was at, then he went back over towards the podium where Lisa

10   was at.

11   Q    Okay.  But to your recollection, where Lisa was at

12   in the store, was he pointing that weapon at her?

13   A    Yes.

14   Q    Is that who he was talking to?

15   A    I couldn't see him talking.  I was trying to get out

16   of the way.

17   Q    Okay.  Did you see him making any gestures?

18   A    With the gun, yes, trying to get her to stand up

19   from behind the podium.

20   Q    Okay.  Was there anybody else there?

21   A    Right there?  I --

22        MS. CHA:  Objection, relevance.

23        THE COURT:  Yeah, I don't know if it's relevant.

24   I'll sustain the objection.

25   Q    (BY MR. GALLON):  Now, let me walk back to the

26   portion where -- well, let me ask you this.  You pulled the

27   videotape; correct?

28   A    Yes, I did.

110

CLAIM III

I.R.T  PAGES 70-71, 97, 114

AND 130.

1          THE COURT:  Well, it is leading.

2          MR. GALLON:  It's a "yes" or "no", your Honor.

3          MS. CHA:  Well, it's still leading.

4          THE COURT:  Yeah.  I will sustain the last

5     objection.  Last response stricken.

6          Jurors disregard the last response.

7     Q    (BY MR. GALLON):  After he had fired one shot while

8     pointing a rifle at you, and then came in further and

9     continued to point the rifle at you and follow you with that

10    rifle, what did you believe?

11    A    That he was trying to kill me.

12    Q    How did -- what happened next?  When he's pointing

13    this gun, did you notice anything about the way he was

14    holding, or what happened?

15    A    He was messing with it.  Like, he took a shot, but

16    it got jammed --

17         MS. CHA:  Objection, speculation.

18         THE COURT:  Okay.  I think the testimony "messing

19    with it, like he took a shot" could stand.  But the last part

20    will be stricken.  So after that part of the response the

21    balance would be stricken.

22         Jurors disregard the balance of the response.

23         You may proceed.

24    Q    (BY MR. GALLON):  Have you ever seen guns before?

25    A    Yes.

26    Q    Have you ever seen people fire guns?

27    A    Yes.

28    Q    In what capacity?

70

1    A    I have one and my husband has one.

2    Q    Have you ever had a gun jam?

3    A    Yes.

4    Q    More than one time?

5    A    Yes.

6    Q    Do you know what it's like when a gun jams?

7    A    Yes.

8    Q    You've made -- you made a statement a moment ago,

9    "like, messing with it like it was jammed;" can you elaborate

10    on what basis you came up with that opinion, that the gun

11    jammed?

12    A    I've seen my husband -- he has a rifle.  And when

13    the bullet -- it gets jammed in there on this part.  And he's

14    trying to shoot it, this part pops out when it's jammed, and

15    he's trying to release it so that he can get that round out

16    because it got stuck.  It didn't follow through.  That's what

17    had happened.

18         THE COURT:  The only thing, you referred to this

19    part -- you're looking at the top of your hand --

20         THE WITNESS:  I don't know what it's called.  It's

21    that opening where you can release a bullet out by cocking

22    back on the rifle.

23         THE COURT:  Sure.

24    Q    (BY MR. GALLON):  And did that conduct by the

25    defendant appear to be similar to things you have seen in the

26    past when that happens?

27    A    Yes.

28    Q    I'd like to show you again the video.  And I would

71

1    I can go.

2        Q    Well, did you gesture to him at all?

3        A    Did I gesture to him?

4        Q    Yeah.  Did you make any hand gestures, or did --

5    well, let me ask you it this way.  The last time when you

6    testified in court, you indicated that he was motioning for

7    you, made a motion towards you.  And then you said that you

8    shook your fingers at him and said "No."  Do you remember

9    that?

10       A    Yes.

11       Q    So you two were communicating?

12       A    This was after I ran past all the registers and on

13   the other side of the carts.

14       Q    Okay.  So when you were shaking your hands at him,

15   what did you mean by that?

16       A    He motioned for me to come -- he had the gun, moving

17   the gun to come this way.

18       Q    And you're saying "No"?

19       A    Yes.

20       Q    And the whole time that's happening, he didn't

21   shoot.  So while you're there and you're running, he's not

22   shooting at you?

23       A    That's when the gun had jammed, when he was doing

24   all that.

25       Q    Or at least you think the gun had jammed at that

26   point.  But he's still motioning for you to come back?

27       A    Yes.

28       Q    Now, in the videotape it shows that when you had

97

1  coax Lisa Martinez to come out; correct?

2      A    Yes.

3      Q    Did you see him do anything else besides coaxing or

4  waving that rifle?

5      A    He brought the gun up like he was trying to fire the

6  shot, and it appeared to misfire, because he looked down at

7  the gun --

8            MS. CHA:  Objection, foundation.

9            THE COURT:  Overruled.

10            THE WITNESS:  He looked down at the gun, and that's

11  when he turned around and walked off.  And he was messing with

12  the bolt, and it appeared he was trying to clear the round.

13      Q    (BY MR. GALLON):  Did you find anything consistent

14  with that on the ground?

15      A    Inside the vestibule we found a live round, yes.

16            MR. GALLON:  Thank you.  Nothing further.

17            THE COURT:  Okay.  Thank you, Counsel.

18            Counsel, you may cross-examine.

19                     CROSS-EXAMINATION

20  BY MS. CHA:

21      Q    Good afternoon, sir.

22      A    Good afternoon.

23      Q    In regards to the dog tag machine, you said that was

24  like a vending machine that went up against the wall?

25      A    Correct.

26      Q    So if that was the vestibule at Wal-Mart, the

27  machine itself is actually up against that wall right there,

28  in other words, the left wall?

114

1    Q    When he tries to fire it?

2    A    Yes.

3    Q    So according to what you see in that video, does it

4    appear as though he's trying to shoot her in the back as she's

5    walking away?

6    A    Yes, it does.

7    Q    I mean, he's pointing it right in her general

8    direction when it does what you thought or would appear to be

9    a jam?

10    A    Yes.

11    Q    And just in your experience you believe it would be

12    a jam?

13    A    Yes.

14    Q    And you have never analyzed the weapon before to

15    know whether or not it had those type of characteristics?

16    A    Correct.  I've never held the weapon.

17    Q    Okay.  I want to show you one other portion.

18         Actually, let me stop it there.  I forgot to ask you

19    about these earlier.

20         I just want to show you what has been marked as

21    People's 23.  Again, going back to you pulling the video tape,

22    reviewing it.  Those two pages of People's 23, those are still

23    video shots of another portion of the camera or the videotape?

24    A    That's off a different camera, yes.

25    Q    Okay.  And finally, if I can have you review the

26    eight pages of People's 25, and just tell me if those are also

27    video stills of the videotape, People's 22.

28    A    Yes, it is.

130

CLAIM III

1 RT PAGES 234-236, 287
305, 312

1    Q    Now, when the gun discharged, did you pull the
2    trigger?
3    A    Yes.
4    Q    Why did you pull the trigger?
5    A    Just to scare her.
6    Q    Just to scare her?
7    A    Yeah.
8    Q    Just for the purpose of scaring someone then?
9        Now, when you pulled the trigger, at any point --
10   did you at any time point the gun at either -- any of the
11   people in the front of the store?
12   A    Huh-uh, no.
13   Q    Why didn't you point the gun at them?
14   A    Because I wasn't trying to hurt no one.
15   Q    Now, when you went up to the store, when you got --
16   well, at that point in time did you know that Lisa Martinez
17   had a gentleman with him -- with her?  I'm sorry.
18   A    No.
19   Q    At any point in time did you notice that there was a
20   gentleman with her?
21   A    No.
22   Q    But you do know what Lisa Martinez looks like?
23   A    Yes.
24   Q    Because you talked to her already?
25   A    Yes.
26   Q    Now, when you went up to the store -- went up to the
27   door, both -- I mean, Lisa Martinez was already inside
28   Wal-Mart; is that right?

234

1     A    Yes.

2     Q    Now, since you discharged the gun in the parking

3 lot, when you were walking up to -- at some point in time did

4 you have to rechamber another bullet?

5     A    Yes, I re --

6     Q    And when did you do that?

7     A    While -- while I was walking towards that store.

8     Q    So when you did that, you were still outside?

9     A    Yes.

10    Q    And what happened when you did that?

11    A    Nothing.  Reload.

12    Q    When you did that outside that store, when it

13 reloaded, you could see the -- well, when you chamber a

14 bullet, you can see the bullet in the gun; right?

15    A    Yeah.

16    Q    Why did you rechamber the bullet?

17    A    I don't know.

18    Q    You don't know?  But you do remember doing that;

19 right?

20    A    Yes.

21    Q    At that point in time did you have any intention of

22 killing anyone?

23    A    Never.

24    Q    Never?  What about shooting the lady that wouldn't

25 give you the money?

26    A    Huh-uh.

27    Q    Why were you taking the gun back to Wal-Mart?

28    A    'Cause I thought it was gonna be easier to get the

1    money.

2    Q    Did you think that because you had the gun, people

3    would now be afraid and give you money?

4    A    Yes.

5    Q    Now, when you went up to the door, did it open?

6    A    No.

7    Q    When the door didn't open, what did you do?

8    A    I looked inside the store and I seen her inside the

9    store.  And I asked her to open the doors.

10    Q    Did you yell it out to her?

11    A    Kind of, yeah.

12    Q    Now, when you told her to open the door, what were

13    you doing?

14    A    I motioned -- I motioned to her with the rifle,

15    "Open the doors," like, sideways.

16    Q    So you had -- you actually had the rifle in front of

17    you then?

18    A    Yes.

19    Q    And you were moving it?

20    A    Yes.

21    Q    Now, when you were doing that to her, did you see a

22    gentleman with her?

23    A    Never.

24    Q    Never?  Now, when you were doing that, did you

25    intend to shoot her?

26    A    Huh-uh.  No.

27    Q    How about -- did you intend to kill her?

28    A    No.

236

1    Q    Did you even try to open those doors?

2    A    No.

3    Q    The place was open for business; correct?

4    A    Yes.

5    Q    Why didn't you just try to go into those doors?

6    A    Because I wasn't thinking.

7    Q    So if -- you saw the video.  You saw the layout of

8    the store.  You see that gun pointing right there,

9    People's 24?

10   A    Yeah.

11   Q    Where is that pointed?

12   A    Towards the window.

13   Q    Yeah, but if you would extrapolate, if you would go

14   another 20 feet behind that window -- and you can clearly see

15   inside that; correct?

16   A    Uh-huh.

17   Q    Because you said you saw her in there?

18   A    Yes.

19   Q    If you were to go 20, 30, 40 feet back from where

20   that gun is pointed now, it's pointed where?

21        MS. CHA:  Objection, speculation, improper

22   hypothetical.

23        THE COURT:  Well, if he could observe the other side

24   of the window, the other side of the glass, what was in the

25   line of sight, I guess.

26        MR. GALLON:  That's the question, your Honor.

27        THE COURT:  So if you understand that is the

28   question, you could answer.

287

1    response.   Jurors disregard the last response.

2        Q    (BY MR. GALLON):  You did not confess to the police

3    of attempt murder; did you?

4            MS. CHA:  Objection, argumentative as to "confess."

5            THE COURT:  Yeah, I think the use of the word.

6        Q    (BY MR. GALLON):  You did not say to the police

7    that, "I tried to kill people;" did you?

8        A    No.

9        Q    In fact, you told the police, "I was just trying to

10   scare people;" correct?

11       A    Yes.

12       Q    Did you ever tell people that you were trying to

13   commit a robbery?

14       A    No.

15       Q    So you did not tell police about the robbery?

16       A    No.

17       Q    And you knew at the time you were talking to the

18   police that attempted murder is very bad?

19       A    No.

20       Q    You didn't know that it was very bad?

21       A    No. Because I wasn't -- my intentions weren't to

22   kill anybody.

23       Q    That's not the question.  Did you know at the time

24   you talked to the detective that attempted murder was bad?

25       A    No.

26       Q    Did you learn that afterwards?

27       A    Yes.

28       Q    So at the time of this incident, you didn't know

305

1      Q     And what are Miranda rights?

2      A     Those are the rights that you are entitled to if you

3   are a suspect in a case.  You need to be advised of that so

4   that you're aware that you could or would have an attorney

5   present if you so choose.

6      Q     And did Mr. Alvarez choose to talk with you?

7      A     Yes, he did.

8      Q     Now, while you're interviewing Mr. Alvarez, did he

9   remain, like, in the bed?

10     A     Yes, he did.

11     Q     And did you ask him questions regarding his

12  involvement in the Wal-Mart incident?

13     A     Yes, I did.

14     Q     Do you remember what it was that he was able to say

15  to you in regards to that incident?

16     A     Well, it -- although he said he wanted to talk to

17  us, it wasn't really a conversation.  It was more I had to ask

18  specific questions.  And then even after asking the questions,

19  at times it was hard to determine whether he was thinking

20  about how to answer it, or if he didn't understand it, or what

21  the problem exactly was.  But ultimately at one point he did

22  state that he didn't recall it at all.

23     Q     And after he said that, was there something else

24  that he said to you?

25     A     Yes, he did.

26     Q     What did he say?

27     A     Later on he said that he had just gone there to

28  scare, or something to the effect of had just wanted to scare

312

CLAIM III

2 RT PAGES 481 - 484

1 submitted.

2     At this point I will request Mr. Alvarez to please

3 rise, stand and face the jury.

4     I will request the clerk to then read the verdicts.

5     THE CLERK: Superior Court of California, County of

6 Riverside, Southwest. The People of the State of California,

7 Plaintiff, Vicente Arraiga Alvarez, Defendant. Case number

8 SWF009113. Verdict: We, the jury in the above entitled

9 action, find the defendant, Vicente Arraiga Alvarez, guilty of

10 a violation of section 664/187, subdivision (a) of the Penal

11 Code, attempted murder, upon Lisa Martinez, as charged under

12 Count I of the Information. Dated September 8th, 2005, by

13 Foreperson, Number 5.

14     Ladies and gentlemen of the jury, is this your true

15 and correct verdict?

16     THE JURY: Yes.

17     THE CLERK: Superior Court of California, County of

18 Riverside, Southwest. The People of the State of California,

19 Plaintiff, Vicente Arraiga Alvarez, Defendant. Case number

20 SWF009113. Finding: As to Vicente Arraiga Alvarez as charged

21 under Count I of the Information, we, the jury in the above

22 entitled action, find the attempted murder was willful,

23 deliberate and premeditated within the meaning of Penal Code

24 section 664/187. Dated September 8th, 2005, by Foreperson,

25 Number 5.

26     Ladies and gentlemen of the jury, is this your true

27 and correct finding?

28     THE JURY: Yes.

481

1          THE CLERK:  Superior Court of California, County of

2    Riverside, Southwest.  The People of the State of California,

3    Plaintiff, Vicente Arraiga Alvarez, Defendant.  Case number

4    SWF009113.  Finding:  We, the jury in the above entitled

5    action, find the defendant, Vicente Arraiga Alvarez, in the

6    commission and the attempted commission of the offense charged

7    under Count I of the Information, personally and intentionally

8    discharged a firearm within the meaning of Penal Code section

9    12022.53, subdivision (C).  Dated September 8th, 2005, by

10   Foreperson, Number 5.

11         Ladies and gentlemen of the jury, is this your true

12   and correct finding?

13         THE JURY:  Yes.

14         THE CLERK:  Superior Court of California, County of

15   Riverside, Southwest.  The People of the State of California,

16   Plaintiff, Vicente Arraiga Alvarez, Defendant.  Case number

17   SWF009113.  Verdict:  We, the jury in the above entitled

18   action, find the defendant, Vicente Arraiga Alvarez, guilty of

19   a violation of section 69 of the Penal Code, resisting an

20   executive officer, to wit, Deputy Chavez and Deputy Gomez, as

21   charged under Count II of the Information.  Dated September

22   8th, 2005, by Foreperson, Number 5.

23         We, the jury -- sorry.

24         Ladies and gentlemen of the jury, is this your true

25   and correct verdict?

26         THE JURY:  Yes.

27         THE CLERK:  Superior Court of California, County of

28   Riverside, Southwest.  The People of the State of California,

482

1    Plaintiff, Vicente Arraiga Alvarez, Defendant.  Case number

2    SWF009113.  Verdict:  We, the jury in the above entitled

3    action, find the defendant, Vicente Arraiga Alvarez, not

4    guilty under Count III of the Information.  Dated

5    September 8th, 2005, by Foreperson, Number 5.

6            Ladies and gentlemen of the jury, is this your true

7    and correct verdict?

8            THE JURY:  Yes.

9            THE CLERK:  Superior Court of California, County of

10   Riverside, Southwest.  The People of the State of California,

11   Plaintiff, Vicente Arraiga Alvarez.  Case number SWF009113.

12   Verdict:  We, the jury in the above entitled action, find the

13   defendant, Vicente Arraiga Alvarez, guilty thereof of

14   violation 245, subdivision (a), subsection (2) of the Penal

15   Code, assault with a firearm, a lesser offense necessarily

16   included in the offense charged under Count III of the

17   Information.  Dated September 8th, 2005, by Foreperson, Number

18   5.

19           Ladies and gentlemen of the jury, is this your true

20   and correct verdict?

21           THE JURY:  Yes.

22           THE CLERK:  Superior Court of California, County of

23   Riverside, Southwest.  The People of the State of California,

24   Plaintiff, Vicente Arraiga Alvarez.  Case number SWF009113.

25   Verdict:  We, the jury in the above entitled action, find the

26   defendant, Vicente Arraiga Alvarez, guilty of a violation of

27   section 664/211 of the Penal Code, attempted robbery, as

28   charged under Count IV of the Information.  Dated

483

1    September 8th, 2005, by Foreperson, Number 5.

2    Ladies and gentlemen of the jury, is this your true

3    and correct verdict?

4    THE JURY:  Yes.

5    THE CLERK:  Superior Court of California, County of

6    Riverside, Southwest.  The People of the State of California,

7    Plaintiff, Vicente Arraiga Alvarez, Defendant.  Case number

8    SWF009113.  Verdict:  We, the jury in the above entitled

9    action, find the defendant, Vicente Arraiga Alvarez, guilty of

10   a violation of section 459 of the Penal Code, burglary, as

11   charged under Count V of the Information.  Dated

12   September 8th, 2005, by Foreperson, Number 5.

13   Ladies and gentlemen of the jury, is this your true

14   and correct verdict?

15   THE JURY:  Yes.

16   THE COURT:  Okay.  Thank you.

17   You may be seated, sir.

18   Would either Counsel like the jury to be polled?

19   Ms. Cha?

20   MS. CHA:  No, your Honor.

21   MR. GALLON:  No, your Honor.

22   THE COURT:  Okay.  With that in mind, unless there

23   is something further of the jury at this point, I am going to

24   have the clerk record the verdicts as read.

25   With that in mind, ladies and gentlemen, I want to

26   thank all of you for being here, for participating.

27   Without me pointing the fingers at anybody, when we

28   were selecting the jury, I'm sure you concluded, as I did,

484

CLAIM III

C.T    PAGES 162 AND 207

000162

**CALJIC 8.66.1**

ATTEMPTED MURDER--CONCURRENT INTENT

A person who primarily intends to kill one person, may also concurrently intend to kill other persons within a particular zone of risk. ▮▮▮▮▮▮▮▮▮▮▮ The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that it is reasonable to infer the perpetrator intended to kill the primary victim by killing everyone in that victim's vicinity.

Whether a perpetrator actually intended to kill the victim, either as a primary target or as someone within a ▮▮▮▮▮▮▮ [zone of risk] is an issue to be decided by you.

xo 36
Jury Instruction

000207

SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE
30755-D Auld Road
Murrieta, CA  92563

People of the State of California
Vs.                          CASE NO.  SWF009113
VICENTE ARRAIGA ALVAREZ

MINUTE ORDER

=====================================================================
Jury Trial (Jury Deliberating)
Date:.09/08/05      Time:   8:30 am    Dept/Div: S202
=====================================================================
Charges:  1) 664/187(A) PC-F C, 2) 69 PC-F C, 3) 245(A)(1) PC-F C
4) 664/211 PC-F C, 5) 459 PC-F C

---------------------------------------------------------------------

6th DAY OF TRIAL
Jury retires at  9:00 to resume deliberations.
Response to Question #1 given to jurors.
Court Reporter A. Fagen reads back to jurors
at 9:11 a.m.
Court Reporter A. Fagen completes read back to
jurors at 10:00 a.m.
At 11:38 jurors indicate they have reached a verdict.
At 12:07, the following proceedings were held:
Honorable ALBERT J. WOJCIK Presiding.
Courtroom Assistant: L. De Loa
Court Reporter: A. Fagan.
People Represented By Deputy District Attorney S. Gallon.
Defendant Represented By DPD K. CHA.
Defendant Present.
At 12:07 jury returns with a verdict.
Clerk reads the verdict.
We the Jury in the above entitled action, find the Deft. VICENTE
ARRAIGA ALVAREZ, GUILTY, in count 01 of a violation of Section
664/187 PC.
Dated: 09/08/2005, and Signed by: # 05 Jury Foreperson.
Jury Finds Enhancement(s) D3-12022.53(c)PC  in count 01 True.
Dated: 09/08/2005, and Signed by: # 5 Jury Foreperson.
We the Jury in the above entitled action, find the Deft. VICENTE
ARRAIGA ALVAREZ, GUILTY, in count 02 of a violation of Section
69 PC.
Dated: 09/08/2005, and Signed by: # 5 Jury Foreperson.
We the jury in the above entitled find the
defendant Not Guilty as to Count 3 the charge
of 667/187(a) PC.
Dated: 09/08/2005, and Signed by: # 5 Jury Foreperson.
Jury reaches a Verdict on Count 03 to a lesser included offense,
a violation of Section 245(A)(1) PC
We the Jury in the above entitled action, find the Defendant



Vicente A. Alvarez #V-99688
Kern Valley S.P B-8-113
P.O. Box 5102
Delano, Ca. 93216

LEGAL MAIL

Kern Valley State Prison
Facility B, Building 6

RECEIVED
APR 24 2008

U.S District Court for the Northern D
U.S. Courthouse
450 Golden Gate Avenue
P.O. Box 36060
San Francisco, Ca. 94102